**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SHANNI SNYDER, and SHANNI SNYDER as natural guardian for minor child Emanuel Snyder, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil No. **2:11-cv-00879-TFM** |
| | ) |
| ALLEN P. POWANDA a/k/a d/b/a POWANDA RENTALS, JEFFREY BOULDIN, MICHAEL DAUGHERTY, WILLIAM BOULDIN, DAVID BERTOK, ROBERT RIZZO, JAMES NOVAK, GREGORY ARENDAS, ROBERT DIPPOLITO, NICHOLAS DREISTADT, WILLIAM SOMBO, CARL STEINKOPF, WILLIAM KAUFFMAN, and ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Defendants. | ) **JURY TRIAL DEMANDED** |

RECEIVED
2011 NOV 23
NOV 2 3 2011
CLERK, U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

**FIRST AMENDED VERIFIED COMPLAINT**

AND NOW COME the Plaintiffs, Shanni Snyder and Shanni Snyder as natural guardian for minor child Emanuel Snyder, and files this, their Complaint:

### A. Introduction

1. This case involves law enforcement officials, led by an Assistant District Attorney in the business of renting apartments to consumers and who has a financial interest in the eviction policies of law enforcement officials in Westmoreland County,

assisted a politically connected landlord, William Scalise, in using "self help" remedies to evict the Plaintiffs from their residence without a judicial order for the purpose of circumventing a *Protection from Abuse* Order. This act of cronyism violated Plaintiffs' rights under the Fourth and Fifth Amendments to the United States Constitution (made applicable to the defendants pursuant to the Fourth Amendment). In an attempt to cover up their wrongdoing and eliminate evidence thereof, in violation of the First and Fourth Amendments to the United States Constitution, certain defendants named herein threatened Plaintiffs with arrest for attempting to videotape the incident at their own residence.

## B. Parties

2. Plaintiffs Shanni Snyder and Shanni Snyder as natural guardian for Emanuel Snyder ("Snyders" or "Plaintiffs")[1] are individuals who, for over six months, resided at 1140 Augusta Circle in Irwin, Pennsylvania. The Plaintiffs continue to maintain the lawful right to live at the address in question as, to date, they still have not been lawfully evicted.

3. Defendant Allen P. Powanda ("Powanda") is an individual residing at 406 Pennsylvania Avenue, Irwin, PA 15642. Powanda is also known as, registers property deeds as, and does business as

---

[1] At times, Shanni Snyder refers to herself as "Shanni" to avoid confusion with other members of her family.

Powanda Rentals along with his other family members. Powanda Rentals maintains a financial interest in how "self help" evictions are handled by the local police departments. Powanda is also employed as an Assistant District Attorney for Westmoreland County, Pennsylvania. No allegations in this Complaint involve Powanda's in-court prosecutorial functions and, instead, focus solely on his conduct in assisting William Scalise with the "self help" eviction without a judicial order. Scalise acted under color of state law when engaging in the unconstitutional conduct outlined here.

4. Defendant Michael Daugherty ("Daugherty"), is an individual who resides at 985 Iris Drive, Irwin, Pennsylvania. Daugherty personally involved himself in the unconstitutional conduct outlined herein. Daugherty is employed by the North Huntingdon Police as the Chief of Police and he acted under color of state law when engaged in the conduct averred herein.

5. Defendant Gregory Arendas ("Arendas"), is an individual who resides at 1330 Julius Street, Irwin, Pennsylvania. Arendas personally involved himself in the unconstitutional conduct outlined herein. Arendas is employed by the North Huntingdon Police as a Police Sergeant and he acted under color of state law when engaged in the conduct averred herein.

6. Defendant David Bertok ("Bertok"), is an individual who resides at 2630 Hi Ridge Drive, Irwin, Pennsylvania. Bertok personally involved himself in the unconstitutional conduct outlined herein. Bertok is employed by the North Huntingdon Police as a Police Sergeant and he acted under color of state law when engaged in the conduct averred herein.

7. Defendant Jeffrey Bouldin is an individual who resides at 461 Meadow Road, Irwin, Pennsylvania. Jeffrey Bouldin personally involved himself in the unconstitutional conduct outlined herein. Jeffrey Bouldin is employed by the North Huntingdon Police as a Police Sergeant and he acted under color of state law when engaged in the conduct averred herein.

8. Defendant Robert Rizzo ("Rizzo") is an individual who resides at 109 Dolores Drive, Irwin, Pennsylvania. Rizzo personally involved himself in the unconstitutional conduct outlined herein. Rizzo is employed by the North Huntingdon Police as a Police Sergeant and he acted under color of state law when engaged in the conduct averred herein.

9. Defendant William Bouldin is an individual who resides in Jeanette, Pennsylvania. William Bouldin personally involved himself in the unconstitutional conduct outlined herein. William Bouldin is employed by the North Huntingdon Police as a police

officer and he acted under color of state law when he engaged in the conduct averred herein.

10. Defendant Robert Dippolito ("Dippolito") is an individual who resides at 2190 Northview Drive, Irwin, Pennsylvania. Dippolito personally involved himself in the unconstitutional conduct outlined herein. Dippolito is employed by the North Huntingdon Police as a police officer and he acted under color of state law when he engaged in the conduct averred herein.

11. Defendant Nicholas Dreistadt is an individual who resides at 102 North Street, Penn, Pennsylvania. Dreistadt personally involved himself in the unconstitutional conduct outlined herein. Dreistadt is employed by the North Huntingdon Police as a police officer and he acted under color of state law when he engaged in the conduct averred herein.

12. Defendant William Kauffman ("Kauffman") is an individual who resides at 904 1st Street, Irwin, Pennsylvania. Kauffman personally involved himself in the unconstitutional conduct outlined herein. Kauffman is employed by the North Huntingdon Police as a police officer and he acted under color of state law when he engaged in the conduct averred herein.

13. Defendant James Novak ("Novak") is an individual who resides at 613 Butterfield Drive, Irwin, Pennsylvania. Novak personally involved himself in the unconstitutional conduct outlined herein.

Novak is employed by the North Huntingdon Police as a police officer and he acted under color of state law when he engaged in the conduct averred herein.

14. Defendant William Sombo ("Sombo") is an individual who resides at 13380 Saint Clair Drive, Irwin, Pennsylvania. Sombo personally involved himself in the unconstitutional conduct outlined herein. Sombo is employed by the North Huntingdon Police as a police officer and he acted under color of state law when he engaged in the conduct averred herein.

15. Defendant Carl Steinkopf ("Steinkopf") is an individual who resides at 409 5th Street, Irwin, Pennsylvania. Steinkopf personally involved himself in the unconstitutional conduct outlined herein. Steinkopf is employed by the North Huntingdon Police as a police officer and he acted under color of state law when he engaged in the conduct averred herein.

16. Defendant Attorney General of the Commonwealth of Pennsylvania is sued for declaratory and injunctive relief only as to the sought declaration that 18 Pa.C.S. 5701, et seq., is unconstitutional to the extent it prohibits the public from videotaping police officers in their own residence, to the extent it allows police to tell citizens to stop recording in their own residences, and to the extent it prohibits the recording of police performing their duties in public.

## C. Jurisdiction

17. Plaintiffs bring this action against the defendants for violations of the First, Fourth, and Fifth Amendments the United States Constitution, made applicable to the state actors pursuant to the Fourteenth Amendment, and 42 USC 1983 and 1988 to redress the deprivation by the defendants of rights secured to the plaintiffs under the Constitution and laws of the United States. This Court maintains jurisdiction over such claims pursuant to 28 USC 1331 (federal question jurisdiction), 28 USC 1343 (original jurisdiction over civil rights claims), and 28 USC 2201 (declaratory and injunctive relief).

## D. Background Facts

18. Several years ago, a house belonging to Shanni Snyder and her family members at 98 Arlene Drive in North Versailles, Pennsylvania, caught fire. Shanni's parents, George Sr. and Sharon Snyder occupied the house. Shanni sometimes occupied the house, but she also rented another house in North Huntingdon, Pennsylvania.

19. The insurance company, Liberty Mutual, arranged for the leasing of a house at 1140 Augusta Circle, North Huntingdon, Pennsylvania, for Sharon to live in. George Sr. chose to remain at 98 Arlene Drive.

20. In early 2010, Shanni Snyder's landlord had disagreements including problems where the landlord would enter the house without permission and problems with mold and maintenance. The landlord sued in February 2010 and obtained a judgment for possession in March 2010. Snyder promptly appealed to the Court of Common Pleas. *Rudeen v. Snyder*, 1814 of 2010 (CCP Westmoreland). The landlord of the 2629 Coulterville filed an eviction Complaint against Plaintiffs. *Id.*

21. During the time Plaintiffs and the landlord litigated the case, Shanni continued to assert in court papers that problems were present at the 2629 Coulterville address including insect infestation, a leaking roof, and mold. *Id.*

22. The 1140 Augusta house, on the other hand, was very large. Therefore, while living at the 2629 Coulterville address, Plaintiffs started staying at 1140 Augusta several nights a week.

23. During the course of litigation, Plaintiffs and Shanni's other child continued to occupy both places, sleeping mostly at 1140 Augusta, but having personal property and items at 2629 Coulterville Road.

24. At no time material to these events did Tammy McCarl (nee Snyder) reside at 1140 Augusta. On the contrary, McCarl lived in Monroeville and, after she married Kevin McCarl, she moved into the residences at Piatt Place in Pittsburgh, Pennsylvania.

25. In 2010, the insurance company quit paying the rent on the 1140 Augusta Circle house because the shelter benefits ran out.

26. At that time, it was agreed between Sharon and Plaintiffs that Plaintiffs and Shanni Snyder's other child would move completely into the house.

27. Because Sharon has a judgment against her for $1,808,676 in favor of the United States, she did not want the lease to be in her name. *United States v. Sharon Snyder*, 2009 U.S. App. LEXIS 12394,*;327 Fed. Appx. 323 (3rd Cir. 2009).

28. Specifically, Sharon did not want the Internal Revenue Service to think that she had $3,000.00 per month to pay in rent for a house. Therefore, Sharon asked Tammy McCarl to place her name on the lease.[2]

29. Despite not having any intention of living at the house, and solely to protect Sharon's assets from the Internal Revenue Service, McCarl agreed to list her name as the lessee.

30. However, since McCarl never maintained any intention of occupying, living at, or using the house, the lease contained specific authorization for the occupants of the house to be two adults and two children. The lease did not require notification to the landlord as to the identity of the occupants and it did not

---

[2] Indeed, Tammy McCarl has been assisting Sharon Snyder launder money for several years, completely paying for Sharon's entire luxurious lifestyle. None of the gifts Tammy McCarl provides Sharon are declared to the IRS.

require Tammy McCarl to live at the house. Rather, the lease states at paragraph 7 that:

> **Occupancy shall be limited to 2 adults and 2 children. Occupation by more people shall be in direct violation of this agreement and shall be the basis for immediate termination in the sole discretion of the Landlord (Owner).**

31. Tammy McCarl does not have children. Sharon's children are all adults. The two adults were to be Sharon and Shanni. The children were Shanni's two children.

32. The lease did not contain a prohibition that prevented Tammy McCarl from subletting the house and it did not specify any limitations on the rights or status of the "2 adults and 2 children" occupants.[3]

33. Because Shanni moved into the 1140 Augusta Circle house with her children, she entered a settlement with the landlord of the 2629 Coulterville house. The settlement was in the form of a Court Order that agreed Shanni would leave the 2629 Coulterville house no later than October 21, 2010. *Rudeen v. Snyder*, 1814 of 2010 (CCP Westmoreland).

34. By October 21, 2010, Plaintiffs and Shanni's other son stayed full time at the 1140 Augusta Circle house.

35. The only resident of the 1140 Augusta house when Plaintiffs moved in was Sharon Snyder. After the Plaintiffs moved in with

---

[3] The Landlord Tenant Act of 1951 makes it clear that the terms of the lease apply to tenants who have been sublet the property.

Shanni's other son, the only residents were Shanni, Emanuel, Matthew, and Sharon Snyder.

36. Tammy McCarl neither resided at nor occupied the house at this time.

37. At no time from the beginning of the lease to the events here, except as stated in this document, did McCarl stay the night at 1140 Augusta Circle.

38. Because some of Shanni's property remained at the 2629 Coulterville house, she negotiated an extension to completely move out of that house by October 25, 2010. *Id.*

39. Plaintiffs removed their belongings from the 2629 Coulterville house and moved them into the 1140 Augusta Circle house shortly before October 25, 2010.

40. From October 25, 2010 forward, Plaintiffs resided solely and exclusively at the 1140 Augusta Circle house along with Sharon and Shanni's other son.

41. On June 20, 2011, Sharon attacked Shanni and assaulted her.

42. Shortly thereafter, and in fear, Shanni left the house for a couple of days.

43. Shanni did not vacate her residence in any manner during this short time period. Shanni did not remove her personal property.

44. On June 27, 2011, Shanni obtained a protection from abuse order from the Westmoreland Court of Common Pleas. The Order

stated that, "[Sharon] is specifically ordered to stay away from the following locations for the duration of order: 1140 Augusta Circle, Irwin, PA 15642." *Shanni Snyder v. Sharon Snyder*, No. 1280 of 2011 D (Westmoreland County Court of Common Pleas).

45. The Order also addressed how Sharon was to obtain her personal effects. The Order stated, "[Sharon] may go back to the residence, one (1) time only, along with a constable to retrieve her personal belongings only. The constable will contact [Shanni] to make these arrangements." *Id.*

46. The Order directed that a copy be provided to the North Huntingdon Police Department. *Id.*

47. On June 27, 2011, after the Court issued the PFA Order, but before it was served, Shanni learned that Sharon was arguing with Plaintiff Emanuel Snyder and becoming aggressive. Therefore, Shanni called the police. When the police arrived, the child advised Defendants Dippolito and Arendas that Sharon had became aggressive and began pointing her finger in his face.

48. Wanting to verify that her children were safe, and desiring to enter her residence without fear of harm, Shanni arrived on the scene.

49. Shanni noted the PFA and asked the police to remove Sharon so she could enter.

55. Defendant Dippolito also noted in his report that after the explanation, the McCarls and Sharon left and that "Shanni and her sons remained."

56. Based on information, Defendant Arendas contacted William Scalise, the landlord, and advised him of the PFA against Sharon. Scalise told Arendas that the lease was in the name of Tammy (Snyder) McCarl, but that she rented it for Sharon. Dippolito's report indicates that Tammy McCarl "leased [the house] for [Sharon] to stay as their previous home was destroyed by fire."

57. After the Sheriff removed Sharon, Shanni and her children became the sole occupants of 1140 Augusta Circle.

58. Shortly thereafter, Tammy McCarl contacted Shanni and advised her that she disagreed with her action in obtaining the PFA Order. Tammy McCarl inferred that retaliation would be forthcoming including the loss of Shanni's children.

59. Tammy McCarl verbally directed Shanni to leave the property on the basis that the lease listed only McCarl's name regardless of the fact that McCarl did not reside there but Shanni did.

60. McCarl then contacted the owner of the 1140 Augusta Circle house, William Scalise, and told him that she would not renew the lease since Plaintiffs caused Sharon to be evicted.

50. Notwithstanding that the PFA Order clearly indicated it should be provided to the North Huntingdon Police, and despite the Order stating that Sharon cannot go near the house, Defendants Dippolito and Arendas stated they would not serve the Order and that Shanni had to wait for the Sheriff to come.

51. Notwithstanding the clear language of the PFA, Dippolito and Arendas further tried to state that the PFA did not require that Sharon leave the house.

52. However, when the Sheriff's Deputies arrived on the scene, the Sheriff's Deputies directed Sharon to leave. They provided Sharon an opportunity to gather her personal belongings.

53. Tammy McCarl and her husband, Kevin, arrived as well. The Sheriff's Deputies explained to Sharon and the McCarls that Sharon needed to leave and that she could return only with a Constable on one occasion after having the Constable make a prior appointment with Shanni.

54. According to Defendant Dippolito's police report, "All matters of the PFA were explained to George and Sherry Snyder while in the presence of Tammi [sic] Snyder and her husband Kevin McCarl. The PFA allows no contact between Sherry and George Snyder [Sr.] with Shanni Snyder nor any contact with [Shanni's children]".

61. McCarl advised the landlord that if Shanni was removed, she would reinstall Sharon at the house and purchase the property as nominee for Sharon.

62. Immediately thereafter, both the owner of the 1140 Augusta Circle house and McCarl began a pattern of harassment and threats directing Plaintiffs to leave the house.

63. On June 28, 2011, Tammy and Kevin McCarl let themselves into the house at 3:00 p.m. and stayed at the house until 1:00 a.m. During this time, Tammy and Kevin McCarl harassed and badgered Shanni Snyder and threatened retaliation, including having her kids "taken away."

64. On June 29, 2011, notwithstanding the PFA Order that directs Sharon to hire a Constable who would make arrangements with Shanni for Sharon to obtain her property, Kevin McCarl began beating on the door to 1140 Augusta Circle. Kevin McCarl did not announce his purpose for being there and appeared to simply want in.

65. Kevin McCarl tried to open the door, tried to enter with a key, and when that did not work, he banged against the door, attempting to forcibly push it open.

66. Fearing what Kevin McCarl would do if he broke in, and considering the apparent rage he had, Plaintiffs took action to secure the doors from the break in.

67. In testimony, Kevin McCarl admitted that he came unannounced on the day he was banging and attempting to enter the house. Specifically, under oath, Kevin McCarl testified:

> Q. My question was, you showed up at this residence at 1140 Augusta Circle knowing that Shanni was living there and her two children without giving any notice, is that correct?
>
> A. Yes.

68. Kevin McCarl further testified that he tried to enter without knocking first. Specifically, he stated:

> Q. Did you knock at the door or did you just open the door?
>
> A. No, I didn't have to. Shanni –
>
> Q. That's not what I asked you. Did you knock at the door; you did not?
>
> A. No, didn't have to.
>
> Q. Okay. And you then what, inserted a key in the door and attempted to open it?
>
> A. Yes, that's what I testified to earlier.

69. After Kevin McCarl failed to break into the house, he called the North Huntingdon Police.

70. Defendants Novak and Rizzo arrived on the scene. Subsequently, Dreistadt went to the location.

71. Defendant Rizzo contacted William Scalise. Scalise and his son came to the location.

72. Defendants Novak and Rizzo told Shanni that they wanted to speak to her.

73. Shanni spoke with Defendants Novak and Rizzo through a window.

74. Shanni repeatedly informed Defendants Novak and Rizzo that she resided at the address and that she was entitled to a *Notice to Quit* under the Pennsylvania *Landlord Tenant Act of 1951*.

75. Defendants Novak and Rizzo directed and instructed Shanni to allow Scalise to enter the house.

76. Defendants Novak and Rizzo told Shanni that she was legally required to allow Scalise to enter the house.

77. When Scalise arrived, Defendants Novak, Rizzo, and Dreistadt directed Shanni to allow him to enter the house. Although Shanni did not grant permission, when she opened the door, police officers entered along with the landlord.

78. Scalise walked around the house.

79. Shanni repeatedly advised the police that she occupied the house, lived at the house, and maintained rights under the Landlord Tenant Act.

80. Shanni objected to Novak, Dreistadt, and Rizzo's forcing her to allow Scalise into the house.

81. After Scalise was done searching the house, he informed Novak and Rizzo that he wanted George Snyder Jr. arrested for damaging the doors.

82. Defendant Rizzo subsequently contact Defendant Powanda. According to Novak's police report, Powanda stated that, "Tammy can tell Shanni to leave right now and if she didn't then it would be defiant trespass. OR we can wait until the lease is up tomorrow at midnight and then at 1201 Mr. Scalise can tell her to leave or it would be Defiant Tresspass [sic]." Rizzo wrote that he discussed the matter with Defendant Powanda. Rizzo asserted in his police report that Powanda stated that Plaintiffs had "no rights under Landlord Tenant because she is not on the lease and the person who is on the lease is moving out of the house and the lease is up within 24 hours. [Powanda] stated that if the current person on the lease tells her to leave it is a Defiant Trespass and at Noon on June 30th when the owner of the home Mr. Scalise takes the property back from Tammi Snyder he can order her out of the house and it becomes a Defiant Tresspass [sic]."

83. At around noon, Defendants Dreistadt, Rizzo, and Novak to Shanni that she need to leave and if she did not leave by 12:01 a.m., she would be arrested for defiant trespass.

84. Shanni again advised that she resided at the house and neither the Landlord, William Scalise, nor the Sublessor, Tammy McCarl, who did not reside at the house, provided a *Notice to Quit.*

85. Shanni repeatedly advised Defendants Dreistadt, Rizzo, and Novak that she resided at the house for nearly a year.

86. In his police report, Defendant Rizzo wrote, "While speaking with Tammy Snyder [McCarl] and her brother, we received conflicting information about how long [Plaintiffs were] living in the house. The time table was between 4 months and 1 year."

87. Defendants Dreistadt, Rizzo, and Novak told Shanni that she must allow Kevin McCarl to enter the house with the Constable and remove their property.

88. Defendants Dreistadt, Rizzo, and Novak were shown the Court Order stating that the Constable must make prior arrangements with Shanni prior to picking up Sharon's belongings.

89. Defendants Dreistadt, Rizzo, and Novak told Shanni that she must allow everyone to come inside and take the property belonging to Sharon.

90. Plaintiffs advised Dreistadt, Rizzo, and Novak that Shanni disputed ownership of some of the items because some of it belonged to her. (Rizzo wrote in his report, "Shanni was telling us that she lived in the house and she is disputing property but admitted to us that most of the belongings were her sisters not hers").

91. Defendants Dreistadt, Rizzo, and Novak again told the Plaintiffs that they had to allow Kevin McCarl and the persons with him into the house, but that they would tell them to come back in one hour so that Shanni could get dressed.

92. Defendants Dreistadt, Rizzo, and Novak again reiterated that Shanni needed to leave the house by midnight.

93. Plaintiffs again asserted that they maintained a right to be at the residence and that Tammy McCarl did not occupy the house and never lived at the house.

94. At that time, Defendant Novak went to Tammy McCarl and brought her back to the house. Defendant Novak had Tammy open the door to the house.

95. At that time, Defendants Dreistadt, Rizzo, and Novak entered the house along with Tammy McCarl.

96. Defendants Dreistadt, Rizzo, and Novak had Tammy McCarl tell Plaintiffs to leave the house by midnight.

97. Plaintiffs attempted to turn on their video recorder to document the incident.

98. As admitted by Novak in his police report, "Sgt. Rizzo, myself and Det Dreistadt stated that we did not want audio recorded. We then left the residence and cleared the scene."

99. Defendants Rizzo, Novak, and Dreistadt threatened Plaintiffs with arrest if they attempted to record them.

100. Thereafter, Defendants Rizzo, Novak, and Dreistadt had a conversation with Tammy McCarl and Scalise.

101. According to Rizzo's police report, Defendants Rizzo, Novak, Dreistadt agreed that Tammy McCarl would tell Plaintiffs that

they needed to be out of the house by noon on June 30th and Tammy even agreed to have her movers take all of Shanni's belongings to the garage where she could easily remove them from the house."

102. Defendants Rizzo, Novak, and Dreistadt then entered Plaintiffs residence without permission and again told Plaintiffs they had to leave and that Tammy McCarl's movers would place their belongings in the garage.

103. Rizzo explains this in his report by stating, "We went back to the house and went inside and explained this to Shanni who refused to believe that she did not have rights under landlord tenant law."

104. The police then left.

105. About forty minutes after the police told Kevin McCarl to come back in one hour, he returned and demanded to enter.

106. Plaintiffs, having consulted with legal advisors, learned that she did not need to let Kevin McCarl in as the Court Order stated that Sharon Snyder may return with a Constable and that the Constable needed to make prior arrangements with Plaintiffs.

107. Additionally, it became evidence that Kevin McCarl intended to take items that did not belong to Sharon Snyder.

108. As a result, Plaintiffs refused to open the door.

109. Kevin McCarl started banging on the door and when he was unsuccessful he had Mark Snyder attempt to enter.

110. Mark Snyder began kicking on the door and damaged the door.

111. Thereafter, Mark Snyder entered ~~kicking in~~ another door.

112. At that time, Kevin McCarl and his Constable entered and began boxing everything in the house, including items belonging to Plaintiffs such as certain furniture and televisions.

113. Defendants Dreistadt, Rizzo, and Novak arrived on the scene again and witnessed Kevin McCarl and the Constable removing items, including Plaintiffs' property.

114. Defendants Dreistadt, Rizzo, and Novak then left.

115. Kevin McCarl, Mark Snyder, the Constable, and the Constable's crew forcibly entered the locked rooms of the house and, in doing so, damaged the doors.

116. According to a police report by Defendant Rizzo, after the incident, he went to Scalise's real estate office and obtained a copy of the lease.

117. Defendant Rizzo gave the lease to Defendant Novak.

118. Defendant Novak took the lease to Defendant Powanda's house.

119. On June 30, 2011, Defendant Rizzo contacted Defendant Powanda a second time.

120. Defendant Rizzo explained to Defendant Powanda about the fact that the Plaintiffs had obtained *Protection from Abuse* Orders and

that Sharon Snyder was removed from the property before the June 29, 2011, incident.

121. Additionally, Rizzo advised Defendant Powanda that Plaintiffs' attorney would be contacting him.

122. According to Defendant Rizzo, "ADA Powanda stated that gives [Plaintiffs] no standing at the residence that anyone can list any address on a PFA form. The lease is up and she still has no legal standing in the residence. [Powanda] stated that it will be a Defiant Trespass if [Plaintiffs] [choose to] stay at the residence after she is told by Mr. Scalise to leave the house. [Powanda] stated that [Scalise] should tell her to leave while the police are present at the residence. I told him that we ran her drivers information and she has a North Versailles, PA residence listed as her address."

123. During the conversation between Defendants Rizzo and Powanda, Scalise called Defendant Novak and advised him that the lease was up on July 1, not June 30. Scalise advised that Plaintiffs' attorney called and left him a message but that he did not plan to return the call.

124. Defendant Powanda, after being advised that the lease expired on July 1, 2011, told Defendant Rizzo that, "If or when Mr. Scalise goes to the house on Friday the same holds true that [Plaintiffs

are] not permitted to be there and it is not a Landlord Tenant case."

125. Notwithstanding that the Court Order stating that the Constable and Sharon Snyder could return one time to obtain the property, Scalise told Defendant Novak that Tammy McCarl would return to the residence in the morning of July 1, 2011, and remove more items belonging to Sharon.

126. Defendant Novak voiced no objection to the disobeyance of the Court Order.

127. On July 1, 2011, Plaintiffs filed a lawsuit against Scalise, the landlord. The suit sought injunctive relief under the Landlord Tenant Act to prohibit the eviction without judicial decree. The Prothonotary of Westmoreland County assigned case 4270 of 2011 to the suit.

128. The defendants and Scalise the landlord knew Snyder went to the Courthouse to file papers asking for a resolution to the case.

129. In the afternoon of July 1, 2011, Scalise informed the Defendants that, since Plaintiffs were at the courthouse, he would give them until 4:00 p.m.

130. At 4:05 p.m. on July 1, 2011, Defendants Jeffrey Bouldin and Sombo arrived at the residence and met with William Scalise.

131. Defendants Jeffrey Bouldin and Sombo stated in a police report that upon arrival, "[Plaintiffs were] in process of moving and boxes were stacked."

132. Defendants Jeffrey Bouldin and Sombo asked Plaintiffs when they would be done, and, according to Defendant Jeffrey Bouldin, Shanni stated by midnight.

133. Defendant Jeffrey Bouldin advised Plaintiffs that they needed "to be gone" from the residence by 9:00 p.m. and that the Defendants "would be back with Mr. Scalise to make sure [Plaintiffs were] gone."

134. Defendant Jeffrey Bouldin then passed this information on to Defendant Arendas for disclosure to the next police shift.

135. At 6:00 p.m. on July 1, 2011, Defendant Steinkopf was told by Defendant Bertok about the incident.

136. According to Steinkopf, Bertok learned about the incident from Defendant Arendas.

137. Defendant Dougherty told Defendant Arendas that if the Plaintiffs do not leave their residence, they are to be arrested for defiant trespass.

138. Defendant Arendas told Defendant Bertok that Defendant Powanda approved this action.

139. Defendant Arendas informed Bertok that Powanda instructed that the case was not a landlord tenant case.

140. At 9:00 p.m. on July 1, 2011, Defendants Steinkopf, Bertok, and William Bouldin went to the residence and spoke with the landlord, William Scalise.

141. Scalise told Steinkopf that he did not have a lease with the Plaintiffs, but that he did have a lease with Tammy McCarl and that Sharon Snyder was his tenant.

142. According to a report by Defendant Steinkopf, Scalise stated to Defendants Steinkopf, Bertok, and William Bouldin that he had "told [Plaintiffs] to vacate the residence numerous times and has given [them] 5 days to move [their] belongings out but she refuses to leave. [Scalise] stated that he advised her to move out of the residence that she was no longer permitted in the residence in front of [Defendants] Rizzo and Novak on June 29, 2011, at 1112 hours."

143. According to a report by Defendant Steinkopf, Defendants Steinkopf and Bertok "walked over to the front door and was met by Shanni Snyder and her 11 year old son who was holding a video camera. Sgt. Bertok told the 11 year old son to stop recording that we did not want our voices recorded that it was a violation of the wire tap law. The 11 year old son then stopped recording." Bertok described this incident similarly. Bertok wrote, "I could see the young boy with a video camera in his hand pointing at our direction. The red record light was on and I

asked him if he was recording us. He said yes and I immediately told him to turn the camera off, that he was violating the Wire Tap Act. He turned the camera off...."

144. According to Steinkopf, "Shanni was asked again by Bertok to leave the residence that she would be able to make arrangements with William Scalise to come back at a later date to pack up her belongings."

145. Bertok wrote that he explained the Plaintiffs that he "was only going to tell [Shanni] this one time, that either she leaves this house immediately on her own or if she refuses, the she will be leaving with us. Shanni stated that she was not leaving. I pointed towards the front door and told her lets go, you are leaving now."

146. Steinkopf further wrote in his report that, "Shanni stated that she had rights under the Landlord Tenn Act laws and needed to be evicted. Shanni pointed to [the lawsuit against Scalise] that was taped to the front door that displayed written in black marker CIVIL."

147. Steinkopf narrated that, "Sgt. Bertok asked her again if she was going to leave the residence and she stated no."

148. During the incident, Defendant Kauffman stood at the door preventing Plaintiffs from leaving.

149. Bertok then instructed Shanni to go with them.

150. Shanni was placed in the back of a police car and driven to the police station by Defendant William Bouldin.

151. At the police station, Steinkopf photographed and fingerprinted Shanni.

152. Defendant Bertok told Scalise to change the locks on the house and to come to the police station when he finished.

153. Defendant Steinkopf directed Plaintiffs not to return to their residence and that they could make arrangements with Scalise to pick up their property.

154. Steinkopf contacted Powanda at his home.

155. Powanda told Steinkopf not to release Shanni unless she "provides an address other than Augusta Circle."

156. On November 9, 2011, Tammy McCarl (nee Snyder) purchased the 1140 Augusta Circle property the landlord, William Scalise, and returned Sharon to the residence.

### E. Pennsylvania's *Landlord Tenant Act of 1951*

157. Pennsylvania enacted a statutory scheme known as the Landlord Tenant Law of 1951 to govern disputed between property owners and residents.

158. Pursuant to Section 250.501 of the *Landlord Tenant Law of 1951*, a landlord is required to serve a *Notice to Quit* upon the resident. In the case of an expired lease, as is the basis the defendants used here, the landlord must provide fifteen (15) days before he

can begin to evict. He cannot simply call the police and have the person removed.

159. Thereafter, pursuant to Section 250.502, the landlord may file suit before a District Justice who would hold a hearing between one week and ten days after the filing.'

160. Under Section 250.503, after the hearing, if the District Justice rules in favor of the landlord, the landlord may apply for a *Writ of Possession* five days after the judgment.

161. The Writ of Possession must be served within forty-eight (48) hours and can be executed on the eleventh day (11) thereafter.

162. Section 250.513 provides a thirty (30) day period to appeal for victims of domestic violence, such as the Plaintiffs, and ten (10) days otherwise.

163. The terms of a lease apply whenever a tenant occupies a residence through a sublease.

164. Section 250.105 makes it clear that any sublessee shall be governed by the lease as well.

165. MerriamWebster.com defines a tenant as, *inter alia*, "One who has the occupation or temporary possession of lands or tenements of another." It refers to the term "occupant" as a synonym.

166. Neither the landlord, William Scalise, nor the sublessor, Tammy McCarl, complied with any of the procedures required by Pennsylvania law to evict the Plaintiffs.

### F. Claims

### COUNT I --
### VIOLATIONS OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT

### AGAINST ALL NAMED DEFENDANTS

167. Paragraphs 1 through 166 are hereby incorporated by reference and realleged as if fully set forth again.

168. As explained above, each of the defendants participated and assisted William Scalise, the landlord, and Tammy McCarl, the sublessor, with a "self help" eviction.

169. The "self help" eviction occurred without reference to the procedures outlined by Pennsylvania's *Landlord Tenant Act of 1951*.

170. The lease did not prohibit Snyder's residency and clearly stated that two adults and two children would live at the residence.

171. Tammy McCarl did not and never did reside at the residence. Scalise knew Tammy McCarl acted as a nominee and sublet the residence to Sharon Snyder and, in any event, for the occupancy by two adults and two children.

172. The defendants collectively knew that Plaintiffs obtained a *Protection from Abuse Order* ejecting Sharon Snyder from the residence.

173. At the time of the ejectment of Sharon Snyder, the defendants knew, or should have known from the clear language of the PFA Order, that the sole remaining residents were the Plaintiffs and Shanni's other son.

174. Although the *Landlord Tenant Act* provides a remedy for the landlord when a lease expires, the defendants instead assisted the landlord and sublessor with a "self help" eviction.

175. The actions of the defendants aided and abetted in the landlord and sublessor's intrusion into the private life of the Plaintiffs and the obstruction of their right to quiet enjoyment of the premises.

176. The actions of the defendants infringed upon the Plaintiffs property rights and their privacy rights, both of which are protected by the Fourth and Fourteenth Amendments to the United States Constitution.

177. In doing so, the defendants acted under color of law.

178. The defendants did not only stand by and allow William Scalise and Tammy McCarl trample on the residency and occupancy rights of the Plaintiffs, they actively participated and even formulated a plan to allow the lease to expire so that William Scalise could, albeit unlawfully, tell Plaintiffs to leave.

179. Long prior to this case, the Supreme Court clarified that police assisting a landlord in an extrajudicial eviction violates the Fourth Amendment. *See Soldal v. Cook County*, 506 US 56, 58 (1992). Pennsylvania federal courts have explained that law enforcement officers who actively assist a private party to evict an occupant "without an order, a writ, a warrant, or any statutory authority [engage in] precisely the type of unreasonable behavior that the Fourth Amendment forbids." *Open Inns, Ltd. v. Chester County Sheriff's Office*, 24 F.Supp. 2d 410, 424 (E.D.Pa. 3rd 1998)(citing *Soldal*).[4]

180. The Defendants, through their threat to arrest Shanni Snyder on serious charges, effectively assisted the landlord in evicting the Plaintiffs and ultimately did evict them.

181. The Defendants, through their direction to Scalise to change the locks, and their instruction to the Plaintiffs not to return to the property, effectively seized the property to which Plaintiffs had possessory rights.

182. The Defendants' actions constituted an invasion of privacy and a seizure of property rights.

---

1. [4] In *Radvansky v. Olmsted Falls*, 395 F3d 291 (6th Cir. 2005), interpreting *Soldal*, the police arrested a tenant for burglary for returning after the landlord changed the locks to his apartment and he broke in. The arrestee sued the police for false arrest, but the district court gave the police qualified immunity. The Sixth Circuit reversed. The Court noted that the arrestee was using the property to house his personal possessions, clothing, and furniture, making him a current tenant with the right to enter and occupy the premises, "who could not, therefore, be found liable for either criminal trespass or burglary."

183. As such, the Defendants, under color of law, violated Plaintiffs' rights under the Fourth Amendment and Fourteenth Amendment to the United States Constitution.

184. Plaintiffs were damaged as a proximate result of the actions of the defendants in that Plaintiffs were evicted from their home, had to find temporary shelter, lost use of their personal property, received an inordinate amount of emotional distress, and incurred myriad expenses.

**COUNT II--**
**VIOLATIONS OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT**

**AGAINST ALL NAMED DEFENDANTS**

185. Paragraphs 1 through 184 are hereby incorporated by reference and realleged as if fully set forth again.

186. Not only did the action of the defendants in formulating a plan to remove Plaintiffs from their residence violate the Fourth Amendment's right to be free from an invasion of privacy and the seizure of property, it also deprived the Plaintiffs of their right to due process.

187. The *Landlord Tenant Act of 1951* constitutes a scheme to provide occupants of residential housing with due process prior to being removed from their house.

188. In this case, it is patently clear that the defendants knew that the Plaintiffs occupied the house.

189. The defendants knew that Plaintiffs' personal belongings were within the house.

190. The defendants clearly discussed the personal property possession with the landlord and the Plaintiffs, so they cannot claim that they did not know that the Plaintiffs were residing in the house.

191. The defendants' own reports indicate that the Plaintiffs lived in the house for between four months and one year.

192. The defendants clearly concocted a plan to allow the lease to expire prior to evicting the Plaintiffs.

193. However, the defendants ignored language within the *Landlord Tenant Act* that provides a landlord must provide fifteen (15) days notice prior to prior to beginning the eviction process.

194. There was no indication of circumstances that carry the potential of immediate, serious bodily harm, which may serve to justify eviction without pre-deprivation process.

195. The defendants knew, or should have know, that the landlord did not have a Writ of Possession and that the eviction was illegal.

196. Second, it is "elementary that procedural due process is implicated only where someone has claimed that there has been

a taking or deprivation of a legally protected liberty or property interest." *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972)

197. It is also well established that possessory interests in property invoke procedural due process protections. See *Fuentes v. Shevin*, 407 U.S. 67, 87, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

198. By actively assisting the landlord and sublessor to perform a "self help" eviction, and by constantly harassing and threatening the Plaintiffs, the defendants violated the Plaintiffs' due process rights to be free from a "self help" eviction and to have quiet enjoyment of the premises as required by the *Landlord Tenant Act*.

199. As such, under color of law, the defendants collectively and individually violated Plaintiffs rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution depriving them of life, liberty, and property.

200. Plaintiffs were damaged as a proximate result of the actions of the defendants in that Plaintiffs were evicted from their home, had to find temporary shelter, lost use of their personal property, received an inordinate amount of emotional distress, and incurred myriad expenses.

**COUNT III--**
**VIOLATIONS OF THE FOURTH AMENDMENT TO THE UNITED**
**STATES CONSTITUTION AS MADE APPLICABLE TO**
**STATES PURSUANT TO THE FOURTEENTH AMENDMENT**

**AGAINST DEFENDANTS NOVAK, RIZZO, AND DREISTADT**

201. Paragraphs 1 through 200 are hereby incorporated by reference and realleged as if fully set forth again.

202. Well established case law from the United States Court of Appeals for the Third Circuit placed the defendants on notice that they are not to involve themselves in disputes over property. In *Abbott v. Latshaw*, 164 F3d 141, 149 (3rd Cir. 1998), cert. denied 527 US 1035 (1999), the Third Circuit made it clear that it is not for law enforcement officers to decide who is entitled to possession of property." Rather, "it is the domain of the courts." *Id.*

203. Defendants Novak, Rizzo, and Dreistadt directed Plaintiffs to allow Kevin McCarl to come into Plaintiffs residence and obtain property.

204. Defendants Novak, Rizzo, and Dreistadt ignored the fact that the Court Order allowing authorization required the Constable to make arrangements with Plaintiffs prior to entering.

205. Defendants Novak, Rizzo, and Dreistadt ignored Plaintiffs dispute that some of the items did not belong to Kevin McCarl or Sharon Snyder.

206. Defendants Novak, Rizzo, and Dreistadt's directive to Plaintiffs to allow Kevin McCarl entry to take whatever property constituted an active participation in a repossession which deprived Plaintiffs of certain furniture items and televisions.

207. Defendants Novak, Rizzo, and Dreistadt's actions, under color of law, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution as made applicable to the states under the Fourteenth Amendment to the United States Constitution.

208. Plaintiffs were damaged as a proximate result in that property belonging to them including furniture and electronic devices were seized by Kevin McCarl and his group.

**COUNT IV--**
**VIOLATIONS OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT**

**AGAINST DEFENDANTS NOVAK, RIZZO, AND DREISTADT**

209. Paragraphs 1 through 208 are hereby incorporated by reference and are realleged as if fully set forth again.

210. Defendant Novak, Rizzo, and Dreistadt, by forcing the Plaintiffs to allow William Scalise to enter their residence without a judicial order violated Plaintiff's right to be free from search and seizure and free from unwarranted invasion of privacy in violation of the Fourth Amendment to the United States Constitution.

211. Defendants Novak, Rizzo, and Dreistadt acted under color of law in forcing Plaintiffs to allow Scalise to enter.

212. The actions of Defendants Novak, Rizzo, and Dreistadt in violating Plaintiffs rights under the Fourth Amendment to the United States Constitution caused the Plaintiffs damage as a proximate result.

**COUNT V--**
**VIOLATIONS OF THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT**

**AGAINST DEFENDANTS NOVAK, RIZZO, AND DREISTADT**

213. Paragraphs 1 through 212 are hereby incorporated by reference and realleged as if fully set forth again.

214. Defendants Novak, Rizzo, and Dreistadt, by entering the residence of Plaintiffs on June 29, 2011, without permission, violated the Plaintiffs' right to be free from unlawful search and seizure and violated the Plaintiffs privacy rights in contravention of the Fourth Amendment to the United States Constitution.

215. Defendants Novak, Rizzo, and Dreistadt acted under color of law.

216. As a proximate result of the Fourth Amendment violations by Novak, Rizzo, and Dreistadt, the Plaintiffs were damaged.

**COUNT VI--**
**VIOLATIONS OF THE FOURTH AMENDMENT TO THE UNITED
STATES CONSTITUTION AS MADE APPLICABLE TO
STATES PURSUANT TO THE FOURTEENTH AMENDMENT**

**AGAINST DEFENDANTS WILLIAM BOULDIN, STEINKOPF,
KAUFFMAN and BERTOK**

217. Paragraphs 1 through 216 are hereby incorporated by reference and are realleged as if fully set forth again.

218. By directing the removal of the Plaintiffs from their residence, and advising that Plaintiffs must make arrangements with William Scalise to pick up their personal property at some other time, Defendants William Bouldin, Kaufmann, Steinkopf, and Bertok allowed William Scalise to take the Plaintiffs property.

219. As a result, Scalise took many items belonging to the Plaintiffs and eventually converted them to his own use or gave them to Kevin and Tammy McCarl.

220. Defendants William Bouldin, Steinkopf, Kauffman, and Bertok acted under color of law in removing the Plaintiffs from their residence and allowing Scalise to take possession of Plaintiffs' property.

221. The actions of William Bouldin, Steinkopf, Kauffman and Bertok in allowing Scalise to take possession of the property constituted a seizure and invasion of privacy under color of state law.

222. As a proximate result of the Fourth Amendment violations by William Bouldin, Kauffman, Steinkopf, and Bertok, Plaintiffs were

damaged in that the following items were retained by Scalise and/or given by Scalise to Kevin McCarl: $3,800.00 cash, Jewelry box 1k with 8-10k in jewelry in it,  In bathroom sapphire necklace with earrings -$1500, 5 Silver rings- $200.00, 2 Cherry Dressers my room– 2k, 2 wine glasses -$30, Clothes rack- $100, 3 Mattresses box springs and mattress pads -$1500, 3 bed frames- $60, 1 iron head board- 1k, 100 cd movies 1k and in boxes, with the stand -$50, ten pictures in frames - $100, 1 white phone/fax machine- $40, Lalique glass vase- $300, extra blankets $100, electric blanket -$30, 2 Seiko watches- $60, 2 alarm clocks- $40, 2 gold dipped roses- $100, Bathroom, Set of Beige towels $100.00, 5 bottles of Framesi shampoo- $100, 4 one gallon bottles of conditioner- $80, Professional hair dryer- $60, flat iron- $100, purses and bags $100, shower curtains $80, Shower curtain hooks- $50, 5 area rugs- $80,2 – shower rods- $20, cleaning supplies- $100, 2 Adult male robes- $100, 1 Victoria secret robe- $50,3 – large wicker laundry baskets -$200, 1shoe box of hardware- $75, 2 mountain bikes, 3 large pieces of luggage- $180, professional hockey stick -$100, 2 – baseballs from the 2006 Pirates all star game- $50,1- professional drum set, 2 pairs of Heely's -$60, paper guitar - $25, guitar- $100,1 – pair of Salomon skis- $180, 2 pair of- Rossignol ski boots- $200, 1 pair of child's mongoose roller blades- $50, 4 - fishing poles

$120, 3 – basketballs -$50, 4 Harlem Globe Trotters basketballs $150, 1 pair adult roller blades- $85, 2 ski poles- $40, 2 aluminum bats -$50, 2 pairs of boxing gloves- $50, 1 pair padded punch blockers- $20, 2 foam targets for blow darts, 2- Kitty litter boxes- $20,10 pieces of Large storage containers, Kitchen dishes 8 piece $100, Casserole dishes pie pans misc. $100, pots and pans - $150, Antique decanter with glasses - $80, Silverware- $40, crock pot- $30, Utensils-$100, food- $600, 1 computer chair- $150, 3 shelf steel and wood shelves - $75, 1 Olympus digital camera - $150, 1 JVC camcorder - $350, 2 Guess leather coats- $300, 1 – spider gear winter coat- $100, 2- North face winter coats-$300, 10- baseball hats- $180, 3 pair of winter boots- $150, 3 face masks- $50, 10 winter hats- $100, 5- pair of gloves- $100,2 - scarves $40, 4- back packs- $200, Harry Potter Nimbus 2000- $250, Harry Potter wall hangings- $60, 6 Harry Potter movies- $100, Dragon Ball Z- whole series- $400, bop it - $10, granite book ends- $30, 3 – bibles - $60, 100 books – 1k, water colors - $50, awards and trophies, boys knickknacks they homemade, 3 photo albums - $40, x-box 360, psp – 3 games, dsi- 15 games, Game Boy- 7 games, 2 game cubes,20 stuffed animals - $200,1 – alligator head - $20, 50 – Nerf guns- plus ammo 1k, 1000- Yugio- Pokemon cards 1k-2k, 1 limited signature series pantera claws - $50, puzzles- $50,3- Zippo lighters- $60, 5 – air

soft guns- $120, 2 sleds- $50, Foam flooring for weight equipment- $80, 4- 25lb weights, 4 10 lb weights, black and white curtains and sheers- $100, 5 Tupperware containers - $100, 5 boxes of clothes –,file folders and stamps - $20, buffet table - $50,2 Easter baskets -$30,2 bowling balls- $120,spy glasses- $15, safe- $20,Professional puppet set - $100,professional magic set- $100,Halloween decorations- $100,Christmas tree- $100,ornaments- $300,wreath - $30,Lighted garland -$100,Mr. and Mrs. Clause on a couch -$80, among other things.

223. In addition to the items not returned as a result of the actions of William Bouldin, Kauffman, Steinkopf, and Bertok, numerous other items were ultimately returned by Kevin McCarl and McCarl's Services, but damaged.  Presently, Plaintiffs have not fully assessed the damage and a list will be provided to the Defendants as it becomes available.

## COUNT VII--
## VIOLATIONS OF THE FIRST AND FOURTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS MADE APPLICABLE TO STATES PURSUANT TO THE FOURTEENTH AMENDMENT

## AGAINST DEFENDANTS WILLIAM BOULDIN, STEINKOPF, BERTOK, NOVAK, RIZZO, and DREISTADT

## AND ACTION AGAINST THE ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA TO DECLARE STATUTE UNCONSTITUTIONAL

224. Paragraphs 1 through 223 are hereby incorporated by reference as if fully set forth again.

225. On June 29, 2011, Defendants Novak, Rizzo, and Dreistadt prevented the Plaintiffs from videotaping in their own residence.

226. Novak, Rizzo, and Dreistadt instructed, under threat of arrest, the Plaintiffs to stop recording.

227. On July 1, 2011, Defendants William Bouldin, Steinkopf, and Bertok directed Plaintiffs to stop videotaping in their own residence.

228. Defendant Bertok cited a so-called *Wire Tap Act* as the criminal offense that prohibits the videotaping.

229. However, Pennsylvania enacted no law that prohibits a person from videotaping or recording sounds or conversations, especially in one's own residence.

230. Apparently, defendants William Bouldin, Steinkopf, and Bertok were referring to Pennsylvania's *Wiretapping and Electronic Surveillance Control Act,* 18 Pa. C.S. 5701, *et seq.*

231. Plaintiffs have clearly established rights to videotape police officers in the performance of their public duties and/or, in this case, engaging in misconduct.

232. This right is accelerated and enhanced when the occurrences took place in Plaintiffs' own home.

233. By instructing Plaintiffs to stop videotaping the conduct of the police in the Plaintiffs own residence, Defendants William Bouldin, Steinkopf, Bertok, Novak, Rizzo, and Dreistadt unlawfully interfered with Plaintiffs' constitutionally protected rights under the First Amendment to the United States Constitution.

234. If 18 Pa.C.S. 5701, et seq., prohibits the voice and video recording of the police activity, in plain view and without an element of covert action, in the Plaintiffs' own home, the statute violates the First and Fourth Amendments to the United States Constitution as made applicable pursuant to the Fourteenth Amendment to the United States Constitution and must be declared unconstitutional.

235. If 18 Pa.C.S. 5701, et seq., enables the police to direct a person, in their own home, to turn off their video and voice recorders, the statute violates the First and Fourth Amendments to the United States Constitution.

236. Plaintiffs desire to record police in their own home when they engage in misconduct, such as this case.

237. Plaintiffs desire to record police when they perform their public duties.

238. Plaintiffs desire to videotape and record the North Huntingdon Police to capture additional evidence of wrongdoing and cronyism.

239. As such, a justiciable controversy exists as to whether Pennsylvania's statutes are constitutional to the extent they prohibit filming the police.

240. Plaintiffs were damaged by the instruction of the police, under threat of arrest, to stop filming.

241. Defendants acted under color of law when they directed the Plaintiffs to stop filming on two occasions.

WHEREFORE, Plaintiffs Shanni Snyder and Shanni Snyder as natural guardian of Mani Snyder respectfully demand that this Court: (1) Declare that the Plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights were violated when the Police Defendants entered the residence, when they removed Plaintiffs and took Shanni to the police station, when they instructed Plaintiffs not to return to where they lived, and when they instructed the landlord to change the lock; (2) Declare that the Plaintiffs Fifth and Fourteenth Amendment rights were violated when the police assisted in the "self help" eviction; (3) Declare that the Plaintiffs'

Fourth and Fourteenth Amendment Rights were violated when the defendants allowed the landlord to enter her residence; (4) Declare that the Plaintiffs Fourth and Fourteenth Amendment rights were violated when the police entered their residence; (5) Declare that the Plaintiffs Fourth and Fourteenth Amendment Rights were violated when the defendants allowed and directed Plaintiffs to allow Kevin McCarl and his group to enter and seize property from the house, including disputed property; (6) Declare that the Plaintiffs Fourth and Fourteenth Amendment rights were violated when the defendants allowed William Scalise to impound Plaintiffs personal property; (7) Declare that the defendants violated the Plaintiffs First, Fourth, and Fourteenth Amendment rights when they directed the Plaintiffs to cease recording the police in their own home; (8) Declare that 18 Pa.C.S. 5701, et seq., is unconstitutional to the extent it prohibits citizens from recording the police engaging in public duties or, as in this case, misconduct; (9) Award actual, compensatory, and punitive damages in an amount to be proven at trial against the individual defendants; (10) Enjoin the Defendants from further aiding the eviction without the landlord providing a Writ of Possession; (11) award costs, attorneys fees, and any other relief this Court may determine is just.

I, Shanni Snyder, declare and state that the foregoing allegations are true and correct to the best of my knowledge (28 USC 1746).

Respectfully submitted,

Shanni Snyder
PO Box 96
East McKeesport, PA  15035
(412) 758-1371

PLAINTIFF

## CERTIFICATE OF SERVICE

I, Shanni Snyder, certify that I mailed a true copy of the Amended Complaint to the following persons on this 23rd day of November, 2011:


**Thomas P. Pellis**
Meyer, Darragh, Buckler, Bebenek & Eck,
P.L.L.C.
40 North Pennsyvlania Avenue, Suite 410
Greensburg, PA 15601                                representing        **ALLEN**
(724) 836-4840                                                          **POWANDA**
(724) 836-0532 (fax)                                                    *(Defendant)*
tpellis@mdbbe.com
 *Assigned: 11/11/2011*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*


**Danielle M. Vugrinovich**
Marshall, Dennehey, Warner, Coleman &
Goggin
600 Grant Street
Suite 2900
Pittsburgh, PA 15219
(412) 803-1185
(412) 803-1188 (fax)


Shanni Snyder

## CERTIFICATE OF SERVICE

I, Shanni Snyder, certify that I mailed a true copy of the Amended Complaint to the following persons on this 23rd day of November, 2011:

**Thomas P. Pellis**
Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C.
40 North Pennsyvlania Avenue, Suite 410
Greensburg, PA 15601
(724) 836-4840
(724) 836-0532 (fax)
tpellis@mdbbe.com
 *Assigned: 11/11/2011*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*

representing        **ALLEN POWANDA**
*(Defendant)*

**Danielle M. Vugrinovich**
Marshall, Dennehey, Warner, Coleman & Goggin
600 Grant Street
Suite 2900
Pittsburgh, PA 15219
(412) 803-1185
(412) 803-1188 (fax)

Shanni Snyder