## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHANNI SNYDER, and SHANNI     )
SNYDER as natural guardian for    )
minor child E.S.,                      )    Civil Action No. 2:11-cv-00879
                            )
           v.             )    Judge Mark R. Hornak
                            )
MICHAEL DAUGHERTY, et al.,     )
                            )
       Defendants.         )

### OPINION

**Mark R. Hornak, United States District Judge**

Pending before the Court are two motions filed by Defendants Michael Daugherty, David Bertok, Robert Rizzo, James Novak, Gregory Arendas, Robert Dippolito, Nicholas Dreistadt, William Sombo, Carl Steinkopf, William Kauffman, Jeffrey Bouldin, and William Bouldin. The first motion is a Motion to Dismiss the Plaintiff's minor son E.S. from this case, ECF No. 38, and the second is a Supplemental Motion for Judgment on the Pleadings, ECF No. 42. The Court has considered Plaintiff Shanni Snyder's Amended Complaint, the pending motions, and the various briefs in support of and in opposition to these motions. ECF Nos. 27, 38-39, 42-43, 48. The matters are ripe for disposition, and, for the reasons that follow, the motions are granted in part and denied in part.

### I. BACKGROUND

The factual allegations in this case are dense and complex. The Court will distill the relevant facts from Plaintiff's Amended Complaint, which describes in great detail how the actions of certain North Huntingdon police officers allegedly violated her and/or her minor son's constitutional rights. When considering a motion for judgment on the pleadings under Fed. R.

Civ. P. 12, the Court must accept the factual allegations in the Amended Complaint as true and draw all reasonable inferences in the Plaintiff's favor. *See Allah v. Al-Hafeez*, 226 F.3d 247, 249 (3d Cir. 2000). Therefore, for the purposes of the disposition of Defendants' Motions, the essential facts are as follows.

Plaintiff Shanni Synder ("Ms. Snyder" or "Shanni")[1], acting pro se on behalf of herself and her son, brings suit pursuant to 42 U.S.C. § 1983 (2006)[2] against the following employees of the North Huntingdon Police Department in their individual capacities: Chief of Police Michael Daugherty ("Chief Daugherty"), Sergeant Gregory Arendas ("Sgt. Arendas"), Sergeant David Bertok ("Sgt. Bertok"), Sergeant Jeffrey Bouldin ("Sgt. Jeffrey Bouldin"), Sergeant Robert Rizzo ("Sgt. Rizzo"), Officer William Bouldin, Officer Robert Dippolito ("Officer Dippolito"), Officer Nicholas Dreistadt ("Officer Dreistadt"), Officer William Kauffman ("Officer Kauffman"), Officer James Novak ("Officer Novak"), Officer William Sombo ("Officer Sombo"), Officer Carl Steinkopf ("Officer Steinkopf") (collectively "Defendant Officers"). Synder alleges in her Amended Complaint that the Defendant Officers violated her First, Fourth, Fifth, and Fourteenth Amendment rights during the course of events surrounding her removal from a rental home located at 1140 Augusta Circle, North Huntington, Pennsylvania.[3]  Am. Compl. ¶¶ 17, 19, ECF No. 27.

Ms. Snyder began to permanently reside at the Augusta Circle rental property with her two children and her mother, Sharon Snyder, beginning in October 2010. Am. Compl. ¶¶ 34, 40. Ms. Snyder never executed a residential lease with the owner of the property, William Scalise

---

[1] This formulation is not intended to display untoward familiarity toward Plaintiff, but is instead intended as an effective means to help distinguish among the numerous "Snyder" references in the Court documents.

[2] Ms. Snyder also brings her action under 42 U.S.C. § 1988 (2006), but the purpose of that statute is to award attorneys' fees to the prevailing party in a civil rights case. *Kentucky v. Graham*, 473 U.S. 159, 164 (1985). Because Ms. Snyder is proceeding pro se, § 1988 does not apply in this case.

[3] Ms. Snyder also lists the Augusta Circle property as being located in Irwin, Pennsylvania. Am. Compl. ¶ 44.

("Landlord Scalise"). *Id.* ¶¶ 28-29, 82.   Instead, Ms. Snyder's sister, Tammy McCarl, née Snyder ("Mrs. McCarl"), signed the rental agreement with the intention of allowing Ms. Snyder, her two children, and her mother to live in the home. *Id.* ¶¶ 29-31. To that end, the lease stated that "[o]ccupancy shall be limited to 2 adults and 2 children." Ans. Ex. A. ¶ 7.   It was a one year lease executed on July 1, 2010 that permitted no assignments, and included the option to purchase. *Id.* ¶¶ 10, 12.

On June 27, 2011, Ms. Synder obtained a protection from abuse order ("PFA") against her mother Sharon Snyder from the Westmoreland County Court of Common Pleas after Sharon allegedly assaulted Ms. Snyder. Am. Compl. ¶¶ 41, 44.   The PFA required Sharon Snyder to leave the premises. *Id.* ¶ 44.   That same day, after Sharon Snyder's departure from the Augusta Circle residence, Mrs. McCarl "verbally directed [Ms. Snyder] to leave the property on the basis that the lease listed only [Mrs. McCarl's] name. . ." because Mrs. McCarl "disagreed with Ms. Snyder's action in obtaining the PFA order." Am. Compl. ¶¶ 58-59. Mrs. McCarl also contacted Landlord Scalise to inform him that she (Mrs. McCarl) would not be renewing the lease on the Augusta Circle home and that she wanted Ms. Snyder removed from the property. *See id.* ¶¶ 60-61 ("McCarl advised the landlord that if Shanni [were] removed, she would reinstall Sharon at the house").

Landlord Scalise and Mrs. McCarl then began to repeatedly direct Ms. Snyder and her children to leave the home. *Id.* ¶ 63. On June 29, 2011, Mrs. McCarl's husband, Kevin McCarl ("Mr. McCarl"), attempted to enter the Augusta Circle residence with a key. *Id.* ¶¶ 64-65. When the key did not work, Mr. McCarl tried to forcibly enter the home, and when that was unsuccessful, contacted the North Huntingdon police. *Id.* ¶¶ 65, 69.   Defendants Rizzo, Novak, and Dreistadt arrived at the scene, followed by Landlord Scalise. *Id.* ¶¶ 69-70.   After speaking

3

with Ms. Snyder through a window, where she repeatedly asserted that she was entitled to a

Notice to Quit under Pennsylvania's Landlord-Tenant Act, Sgt. Rizzo and Officer Novak

informed Ms. Snyder that she was "legally required to allow [Landlord Scalise] to enter the

house." Am. Compl. ¶¶ 73-76.  When Ms. Snyder opened the door, all three police officers and

Landlord Scalise entered without her consent.  *Id.* ¶ 77.  Landlord Scalise proceeded to inspect

the home.  *Id.* ¶ 81.

Sometime later, Sgt. Rizzo contacted Assistant District Attorney of Westmoreland

County Allen Powanda ("ADA Powanda") who advised Sgt. Rizzo that Ms. Snyder was a

trespasser on the Augusta Circle property.  *Id.* ¶ 82.  Sgt. Rizzo allegedly documented the

following in a police report regarding the legal advice he received from ADA Powanda.

> [Mrs. McCarl] can tell [Ms. Snyder] to leave right now and if she didn't then it
> would be defiant trespass.  OR we can wait until the lease is up tomorrow at
> midnight and then at 1201 Mr. Scalise can tell her to leave or it would be Defiant
> Tresspass [sic].  . . .  [Ms. Snyder has] no rights under the Landlord Tenant
> because she is not on the lease and the person who is on the lease is moving out of
> the house and the lease is up within 24 hours. . . .  [ADA Powanda] stated that if
> the current person on the lease tells her to leave it is a Defiant Trespass and at
> Noon on June 30th when the owner of the home Mr. Scalise takes the property
> back from [Mrs. McCarl] he can order her out of the house and it becomes a
> Defiant Tresspass [sic].

*Id.* ¶ 82.  Accordingly, at around noon on, possibly, June 30,[4] Defendants Dreistadt, Rizzo, and

Novak informed Ms. Snyder that she needed to leave by 12:01 a.m. or else she would be arrested

for defiant trespass.  *Id.* ¶ 83.  Ms. Snyder protested, stating that she had not received a Notice to

Quit, even though she had been living in the house from between four (4) months to one (1) year.

*Id.* ¶¶ 84-86.

Shortly thereafter, Mrs. McCarl entered the house escorted by Sgt. Rizzo, Officer Novak,

and Officer Dreistadt.  Am. Compl. ¶¶ 94-96.  Mrs. McCarl again verbally directed Ms. Snyder

---

[4] From this point forward, the exact date of certain events is difficult to ascertain from Ms. Snyder's Amended
Complaint, though the sequence of such alleged events is clear.

to leave the property by midnight.  *Id.* ¶ 96.  Ms. Snyder and/or her son attempted to video record the conversation, but Defendants Rizzo, Dreistadt, and Novak "threatened Plaintiffs with arrest if they attempted to record them."  *Id.* ¶ 99.  The police officers then left the scene.  *Id.* ¶ 98.

The following sequence of events, taking place over the course of approximately two days, constitutes the "self help" eviction that Ms. Snyder contends violated her constitutional rights.  First, Mrs. McCarl arranged for Ms. Snyder's possessions to be moved to the garage "where she could easily remove them from the house."  *Id.* ¶ 101.  Ms. Snyder was informed by Defendants Rizzo, Dreistadt, and Novak that her belongings would be moved to the garage after the officers again entered the Augusta Circle residence without her permission.  *Id.* ¶ 102. Beyond providing her with this information, the three officers apparently did not personally touch or remove any of Ms. Snyder's or her son's possessions from the Augusta Circle home at any time during these events, nor did any other of the Defendant Officers.  *See generally id.* ¶¶ 101-55.

Next, Mr. McCarl entered the home with a Pennsylvania State Constable and began boxing "everything in the house, including items belonging to Plaintiffs such as certain furniture and televisions."  *Id.* ¶ 112.  Defendants Rizzo, Novak, and Dreistadt arrived on the scene and witnessed the actions of Mr. McCarl and the Constable, but did not intervene.  *Id.* ¶¶ 113-14. The officers then left.  *Id.* ¶ 114.

At this time, Sgt. Rizzo obtained a copy of the lease from Landlord Scalise's real estate office and provided it to Officer Novak.  Am. Compl. ¶ 117-18.  Officer Novak contacted ADA Powanda for the second time and reported the following exchange:

> ADA Powanda stated that. . . [t]he lease is up and [Ms. Snyder] still has no legal standing in the residence.  [ADA Powanda] stated that it will be a Defiant Trespass if [Ms. Snyder] [chooses to] stay at the residence after she was told by Mr. Scalise to leave the home. . . . [Scalise] should tell her to leave while the

police are present at the residence. I told him that we ran her drivers information and she has a North Versailles, PA residence listed as her address. . . .

*Id.* ¶ 122. Officer Novak then informed ADA Powanda that the lease actually expired on July 1, 2011 to which ADA Powanda responded "[i]f or when Mr. Scalise goes to the house on Friday the same holds true [as Ms. Snyder is] not permitted to be there and it is not a Landlord Tenant case." *Id.* ¶ 124.

On July 1, Ms. Snyder filed a lawsuit against Landlord Scalise in the Court of Common Pleas of Westmoreland County seeking injunctive relief under the Landlord Tenant Act to prevent her eviction absent a judicial decree. *Id.* ¶ 127. Landlord Scalise accordingly informed Defendant Officers that he would permit Ms. Snyder to stay in the Augusta Circle residence until 4:00 p.m., given that she was at the courthouse. *Id.* ¶ 129.

At 4:05 p.m., Sgt. Jeffrey Bouldin and Officer Sombo arrived at the Augusta Circle home, where they met Landlord Scalise. *Id.* ¶ 130. They observed Ms. Snyder in the process of moving from the residence. Am. Compl. ¶ 131. Sgt. Jeffrey Bouldin told Ms. Snyder that she needed to leave the premises by 9:00 p.m., at which time police officers "would be back with Mr. Scalise to make sure [Ms. Snyder and her son were] gone." *Id.* ¶ 133.

By 9:00 p.m., Ms. Snyder still had not vacated the Augusta Circle home. *Id.* ¶¶ 140, 143. Defendants Steinkopf, Bertok, and William Bouldin met Landlord Scalise at the premises, where Landlord Scalise informed the officers that he had requested that Ms. Snyder leave the rental property multiple times. *Id.* ¶ 142.

> [Landlord Scalise stated that he had] told [Ms. Snyder and her son] to vacate the residence numerous times and has given [them] 5 days to move [their] belongings out but she refuses to leave. [Landlord Scalise] stated that he advised her to move out of the residence that she was no longer permitted in the residence in front of [Defendants] Rizzo and Novak on June 29, 2011 at 1112 hours.

*Id.*

When Sgt. Bertok, Officer Steinkopf, and Officer William Bouldin approached the front door, they noticed Ms. Snyder's eleven (11) year old son video recording their progress. Am. Compl. ¶ 143. Sgt. Bertok told the boy to stop recording, as the officers "did not want [their] voices recorded [. . .] that it was a violation of the wire tap law." *Id.* Ms. Snyder's son turned the camera off. *Id.*

Sgt. Bertok requested that Ms. Snyder leave the residence and informed her that "she would be able to make arrangements with [Landlord Scalise] to come back at a later date to pack up her belongings." *Id.* ¶ 144. However, Ms. Snyder repeatedly refused to comply with the Sgt. Bertok's requests. *Id.* ¶¶ 145, 147, 149. She was, accordingly, taken into custody and removed from the Augusta Circle premises. *Id.* ¶¶ 149-51. After Ms. Snyder was removed, Ms. McCarl bought back the house from Landlord Scalise, and alowed Sharon to return. Pl's Resp. to Def.'s Mot. Dismiss E.S., ECF No. 48, at 2 n.1.

Ms. Snyder initiated this suit against Defendant Officers on July 5, 2011 by filing for in forma pauperis status and attaching a verified Complaint, ECF No. 1. Defendant Officers filed an Answer on August 29, 2011, ECF. No. 4. After co-defendant Powanda filed a Motion to Dismiss, Ms. Snyder submitted an Amended Complaint on November 23, 2011, ECF No. 27. The case was transferred to this Court on December 2, 2011.

On December 21, 2011, Defendant Officers answered the Amended Complaint and subsequently filed two motions pursuant to Fed. R. Civ. P. 12(c), requesting judgment on the pleadings in their favor. The Defendant Officers' first Motion for Judgment on the Pleadings requests that the Court dismiss all claims brought by Ms. Snyder on behalf of her minor son, E.S. ECF No. 38. The second Motion, styled as a Supplemental Motion for Judgment on the Pleadings, ECF No. 43, joined in the arguments set forth by co-defendant Powanda's rather

sparse Motion to Dismiss, ECF No. 41,[5] relating to the doctrine of qualified immunity and Ms. Snyder's alleged failure to disclose her legal counsel ("ghostwriting").  The three arguments presented by Defendant Officers are: (1) Ms. Snyder cannot assert claims on behalf of E.S. because she is proceeding pro se in this matter, (2) Defendant Officers are entitled to qualified immunity from liability and suit for their alleged actions, and (3) Ms. Snyder's claims should be dismissed on the grounds that an undisclosed attorney ghost-wrote her pleadings.

## II.    *LEGAL STANDARD*

Under Fed. R. Civ. P. 12(c), judgment on the pleadings is only appropriate in favor of defendants when they "clearly establish[] that no material issue of fact remains to be resolved" such that they are "entitled to judgment as a matter of law." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (internal quotation omitted).  When reviewing a motion for judgment on the pleadings, a court must view the facts in the plaintiff's complaint as true and draw all reasonable inferences in the plaintiff's favor. *Allah*, 226 F.3d at 249.  In other words, a district court applies the same standard to a judgment on the pleadings as a motion to dismiss pursuant to Rule 12(b)(6), but may also review the answer and instruments attached to the pleadings. *Brautigam v. Fraley*, 684 F. Supp. 2d 589, 591-92 (M.D. Pa. 2010).  Accordingly, the Third Circuit's explanation that a district court must take three steps to determine the sufficiency of a complaint when analyzing a motion to dismiss for failure to state a claim also applies here:

> First, the Court must "take[] note of the elements a plaintiff must plead to state a claim."  Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Third, "whe[n] there are well-pleaded factual allegations, a Court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of

---

[5] ADA Powanda, along with the Attorney General of the Commonwealth of Pennsylvania, was voluntarily dismissed from this suit by Ms. Snyder on April 23, 2012.  ECF No. 50.

the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

*Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 679 (2009)) (internal citations omitted).

The third step of the sequential evaluation requires this Court to consider the specific nature of the claim(s) presented and to determine whether the facts pled to substantiate the claims are sufficient to show a "plausible claim for relief." *See Iqbal*, 556 U.S. at 679. In short, like a motion to dismiss, a motion for judgment on the pleadings should not be granted if a party alleges facts which could, if established at trial, entitle her to relief. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).

## III.   DISCUSSION

### A. MS. SNYDER CANNOT BRING CLAIMS ON BEHALF OF HER MINOR SON GIVEN HER PRO SE STATUS.

In addition to filing this pro se suit against Defendant Officers to vindicate her own constitutional rights, Ms. Snyder states that she brings suit on behalf of her minor son, E.S. Am. Compl. ¶ 1; Pl's Resp. Police Defs.' Mot. Dismiss, ECF No. 48, at 1-4.

However, a plaintiff acting in a pro se capacity cannot represent the interests of her minor child. The Third Circuit held in *Osei-Afriyie v. Med. Coll. of Pa.* that a non-lawyer parent does not have the ability to represent her children in place of an attorney in federal court. 937 F.2d 876, 883 (3d Cir. 1991); *accord Woodruff v. Hamilton Twp. Pub. Sch.*, No. 06-3815(NLH), 2007 WL 4556968, at *3 (D.N.J. Dec. 20, 2007), *adopted by* 2008 WL 4547192 (D. Del. Oct. 9, 2008) (applying *Osei-Afriyie* in the context of a civil rights action); *aff'd, Woodruff v. Hamilton Twp. Pub. Sch.*, 305 Fed. App'x 833 (3d Cir. 2009). The court in *Osei-Afriyie* noted three options to remedy the situation: (1) the parent plaintiff could retain an attorney and bring claims on his and

his children's behalf; (2) the plaintiff could determine not to pursue the litigation, in which case the children's claims would be dismissed without prejudice until they reached the age of eighteen or was emancipated; or (3) the district court in its discretion could appoint counsel pursuant to 28 U.S.C.A. § 1915(d), "if it sees particular merit to their claims and believes that the children otherwise would not be able to secure qualified legal representation and that they would be prejudiced by having to wait until they became old enough to sue on their own." 937 F.2d at 883.

As to the first option, the Court has already allotted ample time in this case for Ms. Snyder and her son to obtain counsel, of which they have not availed themselves. *See* Case Mgmt. Order dated Feb. 9, 2012. While Ms. Snyder asks the Court to adopt the third option, *see* ECF No. 48, at 3, the Court in its discretion finds that, in the context of the claims alleged, there is no exceptional reason that counsel should be appointed at this time for E.S. This leaves only the second option: the claims on behalf of E.S. must be dismissed without prejudice. When he turns eighteen or achieves emancipation, he may elect to pursue them. *See Osei-Afriye*, 937 F.2d at 884. Thus, Ms. Snyder cannot bring claims on behalf of E.S. against the Defendant Officers, and all claims brought on behalf of minor E.S. are dismissed without prejudice.

## B. CONSTITUTIONAL CLAIMS AND QUALIFIED IMMUNITY DEFENSES[6]

Section 1983 provides a federal cause of action for an alleged violation of an individual's constitutional rights. *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010). When analyzing a § 1983 claim, the court's initial inquiry must focus on two essential elements: "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Glasshofer v. Jeffes*, No. 87-0478, 1987 WL 16312, at *1 (E.D. Pa. Aug. 27, 1987) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)); *see Harvey v. Plains Twp. Police Dept.*, 421 F.3d 185, 189 (3d Cir. 2005). Defendants, who are all members of the North Huntingdon Township Police Department, do not contest that they were acting under the color of law in this case. Therefore, the Court need only consider the second requirement of § 1983 – whether a constitutional violation has been asserted.[7]

Whether a constitutional violation is claimed to have occurred is also a prerequisite for a § 1983 defendant's assertion of qualified immunity. In general, the doctrine of qualified

---

[6] As previously stated, the Defendant Officers present their qualified immunity argument, as well as their ghostwriting allegation, in their Supplemental Motion, ECF No. 42. The Court will accept this Motion as an Amendment to Def. Officers' Mot. FRCP 12(c) Dismiss [E.S.], ECF No. 38, because the Supplemental Motion relates to events that occurred prior to its filing. *See* Fed. R. Civ. P. 15(d) (providing that supplemental pleadings relate to "any transaction, occurrence, or event that happened *after* the date of the pleading to be supplemented") (emphasis added); *Martinez v. Quality Value Convenience, Inc.*, 63 F. Supp. 2d 651, 655 (E.D. Pa. 1999) (re-characterizing a supplemental memorandum as a motion to amend the defendant's prior partial motion for summary judgment). The Court's consideration of the Supplemental Motion as an Amendment results in the fair, just and speedy adjudication of this case, and it does not prejudice Ms. Snyder because the Motion merely incorporates arguments already timely presented by other Defendants in this case. *See Select Creations, Inc. v. Paliafito Am., Inc.*, 828 F. Supp. 1301, 1357 (E.D. Wis. 1992) (citing 5 Fed. Prac. & Proc. Civ. § 1194 (3d ed.)); *see also Bechtel v. Liberty Nat. Bank*, 534 F.2d 1335, 1341 n.8 (9th Cir. 1976) (judge in his discretion may permit party to expand the grounds of motion well in advance of hearing). Furthermore, Ms. Snyder received additional time to respond to all Defendants' motions, including Defendant Officers' Supplemental Motion, ECF Nos. 38, 40, 42. *See* Case Mgmt. Order dated Feb. 9, 2012.

[7] The Court also notes that the allegations with regards to specific Defendants' particular unconstitutional conduct are quite hazy. Still, because Ms. Snyder has alleged that the defendants together "actively participated and even formulated a plan" to evict her, Am. Compl. ¶ 178, because she has at least demonstrated some involvement of each individual officer, and because the Defendants have not specifically moved to dismiss any claims on the grounds of lack of personal involvement of any individual officer, such action on the part of the Court would be premature.

11

immunity shields government officials from defending a claim of civil liability when they perform discretionary functions. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). A government official, such as a police officer, will be entitled to qualified immunity from suit unless (1) the officer's conduct violated a constitutional right possessed by the plaintiff and (2) the right was "clearly established" at the time of the officer's allegedly unconstitutional conduct. *Giles v. Kearney*, 571 F.3d 318, 325-26 (3d Cir. 2009). These two steps need not be applied in sequence, which allows a trial court to exercise its discretion to craft the most effective analysis given the circumstances of a particular case. *Pearson v. Callahan*, 555 U.S. 223, 236, 242 (2009). As explained by a unanimous United States Supreme Court in *Pearson*, "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237. Because qualified immunity is not merely a defense to liability, but renders a defendant completely immune to suit, a court should determine at the earliest possible stage whether a grant of qualified immunity would be proper given the facts of the case taken in the light most favorable to the plaintiff. *Giles*, 571 F.3d at 325-26.

Here, Ms. Snyder alleges a number of violations of her constitutional rights that occurred during her removal from Augusta Circle, which she summarizes in various numbered counts. Am. Compl. ¶¶ 167-241. Defendants, in a rather bare-bones filing, move for judgment in their favor on these claims, asserting that they are entitled to qualified immunity for each of their actions. While the Court's task would have been aided greatly had Defendants provided more substance to their motions, the issues having been fairly raised, the Court will address each of these counts and their corresponding defenses in its own order.

.

1. **COUNTS IV AND V: Fourth Amendment Search Claims**

   *a. Reasonable Expectation of Privacy*

According to Ms. Snyder's Amended Complaint, on June 29, 2011, Defendants Novak, Dresitadt, and Rizzo entered the Augusta Circle premises against her will, without a warrant, and in the company of Landlord Scalise, who then inspected the premises. Am. Compl. ¶¶ 209-17 ("Although Shanni did not grant permission, when she opened the door, police officers entered along with the landlord."). She describes this as two constitutional violations: the first for the Officers forcing her to admit Landlord Scalise, and the second for forcing her to admit them. In the Court's view, the unconsented entry of four individuals into the home at one time, in the context as pled, constitutes a single constitutional claim, if a claim at all.

As previously stated, under the first prong of the qualified immunity analysis, the Court must determine if the plaintiff possessed a constitutional right that was abridged by governmental conduct. *Giles*, 571 F.3d at 325. The Fourth Amendment, incorporated to the states by way of the Fourteenth Amendment, protects an individual against an unlawful search or seizure by providing that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.; *Miller v. Hassinger*, 173 F. App'x 948, 952 (3d Cir. 2006). An illegal search occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed" *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 63 (1992), or when there is a physical intrusion of a constitutionally protected area, *United States v. Jones*, 132 S. Ct. 945, 951 (2012). The Court has warned that the "Fourth Amendment inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (internal quotations omitted).

In determining the reasonableness of the expectation of privacy, "[a]lthough property law is not controlling, neither is it irrelevant." *United States v. Kennedy*, 638 F.3d 159, 165 (3d Cir. 2011). "Fourth Amendment standing turns on legitimate expectations of privacy and not . . . on concepts of property-law trespass. . . . The relevant question is whether [Plaintiff] had an objectively reasonable expectation of privacy." *United States v. Correa*, 653 F.3d 187, 191-92 (3d Cir. 2011) (addressing plaintiff standing for search of common areas in apartment), *cert. denied*, 132 S. Ct. 1856 (2012). For this reason, the Third Circuit has held that a non-owner who resided at the owner's house with the owner's permission had a reasonable expectation of privacy in the house, despite the fact that he was not a tenant. *Eiland v. Jackson*, 34 F. App'x 40, 41-42 (3d Cir. 2002).[8]

Whether Ms. Snyder enjoyed the legal status of trespasser or tenant is explored in another context below. However, viewing the facts here in the light most favorable to Ms. Snyder, even if she were a trespasser under Pennsylvania law, it does not necessarily follow that this status extinguished any expectation of privacy she might have had in the dwelling. Although she was not a signatory to the lease, and both Ms. McCarl and Landlord Scalise informed her she was no longer welcome on the premises, other facts militate in favor of Ms. Snyder's privacy interest in the apartment. These include the length of time she lived there, that the possessions in the apartment were mostly hers, and that she possessed one of the few keys to the apartment. At present, given the Supreme Court's admonition that the Fourth Amendment reasonableness inquiry is "heavily dependent on the facts," *Pearson*, 555 U.S. at 237, this Court is unable to conclude that accepting all of Ms. Snyder's facts as true and drawing all reasonable inferences in

---

[8] In contrast, the D.C. Circuit held in *United States v. Gale*, 136 F.3d 192, 195 (D.C. Cir. 1998) that an occupier of an apartment who could not prove he *ever* had permission from the tenant to stay on the premises had no "legitimate expectation of privacy" in the apartment.

favor of Ms. Snyder, any expectation of privacy she had in the dwelling was objectively
unreasonable.

####### b. Consent

Assuming that Ms. Snyder had sufficient standing to assert an expectation of privacy on
the premises, it would still not have been infringed if she consented to the search of her
apartment by opening the door at the request of the officers.

> It is . . . well settled that one of the specifically established exceptions to the
> requirements of both a warrant and probable cause [under the Fourth
> Amendment] is a search that is conducted pursuant to consent." *Schneckloth v.*
> *Bustamonte,* 412 U.S. 218, 219 (1973). The Supreme Court has "long approved
> consensual searches because it is no doubt reasonable for the police to conduct a
> search once they have been permitted to do so." *Jimeno,* 500 U.S. at 250–51. To
> justify a search based on consent, the Government "has the burden of proving that
> the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,*
> 391 U.S. 543, 548, (1968). This burden "is not satisfied by showing a mere
> submission to a claim of lawful authority." *Florida v.Royer,* 460 U.S. 491, 497
> (1983).

*United States v. Price,* 558 F.3d 270, 277-78 (3d Cir. 2009). Here, the Defendant Officers
allegedly spoke to Ms. Snyder through a window, and over her assertions that she was entitled to
a state law Notice to Quit, Sgt. Rizzo and Officer Novak informed her that she was "legally
required to allow [Landlord Scalise] to enter the house." Am. Compl. ¶ 73-76. Ms. Snyder states
that she then opened the door, and all three police officers and Landlord Scalise entered "without
permission." *Id.* ¶ 214. Although it might appear incontrovertible that Ms. Snyder consented to a
police search when she opened the door to them, if she was in fact opening the door in response
to a "mere submission to a claim of lawful authority," *Royer,* 460 U.S. at 497, consent was
invalid. Therefore, there remains at least a genuine issue of material fact as to whether there was
consent to the search.

### c. Qualified Immunity

Even if Ms. Snyder enjoyed a reasonable expectation of privacy in the apartment that was the subject of an illegal search, she still must show that the Defendant Officers are not entitled to qualified immunity for their actions. "An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment. This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 243-44 (internal citations omitted). "A right is clearly established for qualified immunity purposes where its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012), *cert. denied*, 11-1357, 2012 WL 1657210 (June 25, 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). An officer's exact actions need not have been held specifically unconstitutional by legal precedent; rather, the unlawfulness of an action must be apparent when are viewed "in the light of pre-existing law." *Anderson v. Creighton*, 438 U.S. 635, 640 (1987). Whether a right is "clearly established" also turns on how narrowly a trial court defines the right in question. *Id.* at 639; *Wilson*, 526 U.S. at 615. For this reason, the Supreme Court explained that "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Id.*

The Third Circuit and its district courts have been wary of finding qualified immunity as a matter of law with respect to warrantless searches. Related to the question here, the Third Circuit has denied summary judgment in a § 1983 Fourth Amendment suit, where police assisted a landlord in entering a tenant's house to effect a private repossession, when it was doubtful that the police had verified the consent of the tenant to enter. *Harvey v. Plains Twp. Police Dept.*, 421

F.3d 185 (3d Cir. 2005). In defining the particular Fourth Amendment right of which the *Harvey* defendants should have been on notice, the court stated "there is no need to 'particularize' the Fourth Amendment right implicated here beyond 'the basic rule, well established by Supreme Court cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional.'" *Id.* at 194 (quoting *Groh v. Ramirez*, 540 U.S. 551, 564 (2004)). Similarly, district courts in this circuit have been hesitant to permit, without the development of a factual record, claims of qualified immunity predicated on Fourth Amendment violations when such claims rely on the validity of the plaintiff's consent, *see Reppert v. Kummerer*, 05-CV-01403, 2006 WL 2590504 (E.D. Pa. Sept. 6, 2006), *aff'd in part sub nom. Reppert v. Marino*, 259 F. App'x 481 (3d Cir. 2007), and when claims of qualified immunity rely on whether the officer had acquired sufficient information and documentation to ensure that he was permitted to enter the premises, *see Gale v. Storti*, 608 F. Supp. 2d 629, 634 (E.D. Pa. 2009).

With that foundation in place, this Court must determine whether given the surrounding circumstances a reasonable officer would have known that, under the Fourth Amendment, it would be unlawful to enter the Augusta Circle residence without a warrant or without Ms. Snyder's freely given consent. Viewing the facts in the light most favorable to Ms. Snyder, Ms. Snyder opened the door only because the officers told her she was "legally required" to do so. Am. Compl. ¶ 76. Based on the pleadings before the Court, it is unclear whether the officers had any knowledge, beyond what Mr. McCarl and Mr. Scalise told them, which contradicted the information relayed by Ms. Snyder regarding her legal right to tenancy at Augusta Circle. It may prove to have been unreasonable for officers to enter that residence without a warrant, given only the verbal affirmations of two individuals against the affirmations of one who was refusing entry. More importantly, it unclear whether (or to what extent) the Defendant Officers knew or had

17

reason to know Mrs. Snyder *resided* at the premises, regardless of her potential legal real estate interest. Thus, without a developed record, it is inappropriate to conclude that the Defendant Officers are entitled to qualified immunity. Therefore, Defendants' Motion for Judgment on the Pleadings is denied without prejudice with regard to Counts IV and V.

## 2. COUNT II: Fourteenth Amendment Due Process Claim

Ms. Snyder alleges that Defendant Officers ignored the requirements of Pennsylvania's Landlord-Tenant Act of 1951 and assisted Landlord Scalise in a "self help" eviction when they physically removed her from the apartment and had Landlord Scalise change the locks, which resulted in Mrs. Snyder's loss of possession of the apartment and personal belongings inside. She alleges that this action infringed upon (1) her Fifth and Fourteenth Amendment rights to procedural due process,[9] as well as (2) her Fourth Amendment right to be free from unreasonable seizures. The Court will address these two separate constitutional claims in turn.

### a. *Sufficiency of Ms. Snyder's Due Process Interest*

This Court will analyze Ms. Snyder's Due Process claims under the Fourteenth, not Fifth, Amendment because the Fifth Amendment's protections only apply to actions of the federal government, and the Defendants in this case are state governmental officials. *Rittenhouse Entertm't, Inc. v. City of Wilkes-Barre*, -- F. Supp. 3d -- , No. 3:11-CV-617, 2012 WL 928488, at *11 (M.D. Pa. Mar. 19, 2012) (citing *B & G Const. Co., Inc. v. Dir., Office of Workers' Comp. Programs*, 662 F.3d 233, 246 n.14 (3d Cir. 2011)).

---

[9] The Due Process clause of the Fourteenth Amendment contains both substantive and procedural components. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Substantive due process "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them" (internal quotations omitted). *Id.* Ms. Snyder's Amended Complaint, read in the light most favorable to Ms. Snyder, alleges only a *procedural* due process violation. Am. Compl. ¶¶ 185-200. Defendant Officers contend in their briefs that Ms. Snyder's *substantive* due process rights were not abridged, ECF No. 41 at 9-10; Br. in Supp. Mot. J. Pleadings, ECF No. 43, at 3. Because Ms. Snyder alleged no substantive due process violation, these arguments need not be addressed.

Fourteenth Amendment procedural due process creates a "guarantee of fair procedure" whereby an individual can assert that she was deprived of a life, liberty, or property interest without due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). However, as a threshold matter, the aggrieved party must demonstrate that she possessed an interest protected by the Fourteenth Amendment in order to bring a successful procedural due process claim. *Acierno v. Cloutier*, 40 F.3d 597, 616 (3d Cir. 1994); *Renchenski v. Williams*, 622 F.3d 315, 325 (3d Cir. 2010). This property interest must be one which is legally protected by a source outside of the Due Process Clause: "Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The Third Circuit held in *Abbott v. Latshaw*, 164 F.3d 141, 144 (3d Cir. 1998) that "possessory interests" in property are protected by the Fourteenth Amendment. However, whatever possessory interest existed in Ms. Snyder's case does not rise to that protectable level.[10]

An analysis of Pennsylvania property law also reveals that Mrs. Snyder had no legally cognizable real estate interest in the premises. While Pennsylvania law is sparse on the subject, it appears that a non-signatory to a lease assumes the status of a trespasser and thus has no right to possession once the landlord asks her to vacate the premises, regardless of the amount of time she has lived there. *See, e.g., Hughes v. Zimmerman*, No. 03-00,809, 2003 WL 25949951 (Pa. Com. Pl. Sept. 11, 2003) (holding plaintiff occupying rental property "openly and notoriously for

---

[10] *Abbott* is distinguishable on its facts. In that case, a man had paid for and driven a car for seven years, despite the fact that there was a dispute as to title over the vehicle. 164 F.3d at 144. Here, Ms. Snyder lived in her apartment for no longer than one year, and the two people holding valid interests in the property, the landlord and the tenant, both unequivocally wished to oust her, and all parties acknowledged that the lease had expired by its own terms prior to her removal.

almost four full years" was, regardless, a trespasser because "the mere fact that [plaintiff] was living at the leased premises does not create a landlord-tenant relationship between him and [the landlord]"); *Clarenbach v. Giordano*, 11 Pa. D. & C. 3d 195, 198-199 (Pa. Comm. Pl. 1978) (holding plaintiff was trespasser on premises because her boyfriend had executed the lease with the landlord and her name did not appear on the lease).

In both cases, the Pennsylvania courts held that the resident's trespasser status did not entitle him or her to the protections of the Landlord-Tenant Act of 1951, which safeguards the property interest of a tenant and gives a right to notice and hearing before eviction. *See* 68 Pa. Stat. Ann. § 250.501 *et seq.* Thus, it appears that in Pennsylvania if a person is not a signatory to a lease, she becomes a trespasser when the landlord or leaseholder's permission for her to live there is revoked, even if she has lived in a rental dwelling for an extended period of time. While Ms. Snyder continually asserts throughout the Amended Complaint that she enjoyed the legal status and interest of a full-fledged tenant, and Mrs. McCarl was a "sub-lessor," this is a self-generated legal conclusion to which this Court owes no deference, especially in light of the fact that the lease by its terms permitted no assignments. *See Iqbal*, 556 U.S. at 678.

To the extent Ms. Snyder had any protectable right in the property, such right was not one infringed upon because of a lack of a hearing. Pennsylvania law is both sparse and unclear regarding a landlord's ability to resort to self-help measures to remove from a property an individual who does not possess a tenancy with the landlord. *See Paster v. Henry*, Civ. A. No. 94-4800, 1995 WL 3674, at *4 (E.D. Pa. Jan. 4, 1995) ("[W]hether self-help eviction for nonpayment of rent is permissible remedy for a landlord under Pennsylvania law is unclear.").

For example, in *Clarenbach*, a landlord entered into a lease with the plaintiff's boyfriend, with whom the plaintiff began to cohabitate. 11 Pa. D. & C. 3d at 196. *Id.* After the boyfriend

20

stopped paying rent and abandoned the residence, the landlord informed the plaintiff that she would have to vacate the premises. *Id.* at 196-97. When she failed to leave, the landlord changed the locks. *Id.* at 196. The plaintiff brought an action against the landlord, alleging violations of the Landlord-Tenant Act through the self help eviction. *Id.* at 197, 199. The Court of Common Pleas of Philadelphia County held that the landlord was not required to follow the Act because in that instance there was no tenancy relationship between him and the plaintiff. *Id.* at 199.

> Cohabitation in the leased premises with the acquiescence of the lessee does not establish a tenancy relation with the landlord. . . . Where the tenancy is not within the mutual contemplation of the parties, the law will not construct one. In this case, when the defendant learned that his lessee had abandoned the premises, he told plaintiff that she would have to leave, a clear indication that she did not have his permission to occupy the premises. . . . Against a trespasser in possession, the landlord has a right to the remedy of self help and is not required to revert to any legal process. . . .

*Id.* at 198-99; *accord Hughes v. Zimmerman*, No. 03-00,809, 2003 WL 25949951 (Pa. Com. Pl. Sept. 11, 2003) (plaintiff in similar situation not entitled to protection of Landlord-Tenant Act). Contrary to the holding in *Clarenbach*, an alternative line of Pennsylvania cases suggests that self-help evictions, in general, should be prohibited as a matter of state law. *See, e.g., Kuriger v. Cramer,* 498 A.2d 1331, 1337 n.14 (Pa. Super. Ct. 1985) (noting that other jurisdictions recognize that self-help evictions give rise to cause of action against the landlord); *Wofford v. Vavreck*, 22 Pa. D. & C. 3d 444, 449 (Pa. Comm. Pl. 1981) (holding self-help evictions prohibited on public policy concerns, such as deprivation of shelter, collecting cases).

### b. *Qualified Immunity*

The proper qualified immunity inquiry here is whether a reasonable officer in the Defendant Officers' position would have believed that participating in a "self help" removal of Ms. Snyder was unconstitutional in light of clearly established law. *See Sharp*, 669 F.3d at 159.

21

As noted above, Ms. Snyder's legal status under Pennsylvania law was at best a tenant at sufferance (whose permission to remain on the premises had been revoked) and at worst a trespasser. Further, whether that status entitled Mr. Scalise to self help under Pennsylvania law, and thus permitted police involvement in his actions under the law, is legally unclear.

Perhaps in light of this uncertainty, the police officers contacted ADA Powanda multiple times before assisting in removing Ms. Snyder to ensure that they had the legal authority to do so. The Third Circuit has held that an officer's reliance on legal advice when taking action strongly supports a grant of qualified immunity. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 255-56 (3d Cir. 2010). "[E]ncouraging police to seek legal advice serves such a salutary purpose as to constitute a thumb on the scale in favor of qualified immunity." *Id.* at 255. As long as a police officer relies on such advice in good faith, and such reliance is "objectively reasonable," he is entitled to a presumption of qualified immunity. *Id.* at 256; *see also Trout v. Wentz*, No. 1:10-CV-0439, 2011 WL 98713, at *7 (M.D. Pa. Jan. 12, 2011); *Quiles v. C.M. Vitt*, No. 1:09-CV-580, 2010 WL 5559507, at *9 (M.D. Pa. 2010) (base commander's reliance on legal advice from the Navy's Office of General Counsel was "powerful proof" that he was entitled to qualified immunity). Additionally, the Third Circuit has stated that "[t]he qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

In Ms. Snyder's case, Officer Rizzo spoke to ADA Powanda to seek his legal advice prior to effecting her removal, conversations both Officers Novak and Rizzo recorded in written reports. Am. Compl. ¶¶ 82-124. ADA Powanda advised the officers that Ms. Snyder was a defiant trespasser under Pennsylvania law with no right in the Augusta Circle residence. Given

the pronouncement of the Pennsylvania courts as recently as 2003 that a person in Ms. Snyder's situation has no rights of possession, *Hughes*, 2003 WL 25949951, and from one of our sister federal courts in 1995 that self-help may be permissible under Pennsylvania law, *Paster*, 1995 WL 3674, at *4, this Court cannot say that ADA Powanda's advice was so objectively unreasonable that the police acted contrary to clearly established law when they conducted the removal pursuant to it.

While the Third Circuit in *Abbott* stated that "it is not for law enforcement officers to decide who is entitled to possession of property," 164 F.3d at 149, the facts of the instant case put it in a different category than *Abbott*. In that case, the plaintiff ("Abbott") and his ex-wife ("Latshaw") had competing claims to a van that had been previously owned by Latshaw's father. Latshaw's father and Abbott had signed a bill of sale indicating that title would transfer to Abbott once Abbott had paid off all loans for the van. *Id.* at 144. Abbott drove the van exclusively for seven years, but never had title transferred to his name. After the divorce, Latshaw's father conveyed title to her. She took the title and a temporary registration to a constable ("Diehl"), who found Abbott and demanded that he surrender the van. Abbott refused, stating that he had at his residence a bill of sale proving his ownership of the vehicle, that he had paid for the van, and that he was the sole driver for seven years. Diehl called the police, who, after reviewing only Latshaw's paperwork, told Abbott that Latshaw was entitled to immediate possession. Abbott's attorney arrived on the scene and argued on his behalf.

The altercation ended when, during the police detention of Abbott for disorderly conduct, Latshaw drove off in the van. *Id.* at 145. It appears that the course of events in *Abbott*, from when Diehl notified Abbott that the van did not belong to him to when the van was taken, took place within a single afternoon. *Id.* The Third Circuit disavowed Diehl's "curbside courtroom"

23

and his "single-minded reliance on Latshaw's documentation," when he "ignored the broader context of the seizure which militated against the legality and reasonableness of his hasty conclusion that Latshaw, not Abbott, was entitled to immediate possession." *Id.* at 149.

The rough justice doled out in *Abbott* does not at all resemble the facts here. The law enforcement officers involved here made repeated trips to the premises over a number of days to speak to Ms. Snyder and to give her notice of her removal. They sought legal advice from ADA Powanda on two separate occasions. They also spoke with Mr. Scalise and the McCarls, who told them that Ms. Snyder was not authorized to be on the premises. They reviewed the lease, which showed that Ms. Snyder did not have a leasehold interest in the Augusta Circle residence, that no assignments of the tenancy were permitted, and that the lease was to expire on June 30, 2012, the day before the removal. They checked Ms. Snyder's driver's information, which showed another property listed as her residence. These actions pushed the police's conduct into the category of reasonableness in their determination that Ms. Snyder did not have a property interest in the premises and was not entitled to a hearing before her removal. Based on the facts as it has them, the Court is not willing to declare that the law was at that time clear and settled that a federal due process right always requires a hearing before the removal of a trespasser. Thus, Defendant Officers are entitled to qualified immunity as a matter of law, and Defendants' Motion for Judgment on the Pleadings on Count II is granted.

### 3.  **COUNT I: Fourth Amendment Seizure of Premises Claim**

In addition to claiming a Fourteenth Amendment procedural due process violation, Ms. Snyder also alleges that her "unlawful eviction" constituted an unreasonable seizure in violation of the Fourth Amendment.

24

### a. *Sufficiency of Ms. Snyder's Fourth Amendment Interest*

The participation of a police officer in an improper eviction can constitute a seizure in violation of the Fourth Amendment. "The Supreme Court has taken an 'expansive view of the concept of seizure,' as set forth in *Soldal*, 506 U.S. at 61-65 ('a Fourth Amendment 'seizure' of property occurs when there is some meaningful interference with an individual's *possessory interests* in that property.')". *Abbott v. Latshaw*, 164 F.3d 141, 149 (3d Cir. 1998) (internal citation abbreviated) (emphasis added); *Gomez v. Feissner*, 474 F. App'x 53, 57 (3d Cir. 2012). Courts have found such an interference in the case of an improper eviction. *See Soldal*, 506 U.S. 56; *Thomas v. Cohen*, 304 F.3d 563, 570 (6th Cir. 2002); *Gale v. Storti*, 608 F. Supp. 2d 629, 633 (E.D. Pa. 2009); *Gerhart v. Com. of Pa.*, CIV.A. 09-CV-1145, 2009 WL 2581715, at *3 (E.D. Pa. Aug. 13, 2009) ("The acts of police officers in assisting an illegal eviction without an order, a writ, a warrant, or any other statutory authority can constitute an unreasonable seizure in violation of the Fourth Amendment.").

Like the right secured by the Fourteenth Amendment, the Fourth Amendment right is predicated on a "possessory interest" in property. *See Soldal*, 506 U.S. at 61. This Court can discern no meaningful difference between a possessory interest in property for the purposes of the Fourteenth Amendment and a possessory interest in property for the purposes of the Fourth. The Court has already concluded above that Mrs. Snyder enjoyed no such possessory interest. Additionally, in *Eiland v. Jackson*, 34 F. App'x 40, 42 (3d Cir. 2002), the Third Circuit held that a non-owner of a residence, who lived at the owner's house with the owner's permission, had no possessory interest (for purposes of a Fourth Amendment seizure analysis) in the doors of the house that were damaged when police entered. Like the plaintiff in *Eiland*, and for the reasons noted above in Part III.B.2, Ms. Snyder's tenuous status as an occupant at sufferance of the

apartment did not give her a possessory interest that would give rise to the protections of the Fourth Amendment against unreasonable seizures any more than it would give rise to the protections of the Fourteenth Amendment.

Moreover, under the Fourth Amendment, the seizure must be an "unreasonable" one. The "reasonableness determination will reflect a careful balancing of governmental and private interests." *Soldal*, 506 U.S. at 71 (internal quotation omitted); *Open Inns, Ltd. v. Chester Cnty. Sheriff's Dept.*, 24 F. Supp. 2d 410, 424 (E.D. Pa. 1998). However, because the Court concludes that Ms. Snyder enjoyed no legitimate possessory interest in the apartment, she has no private interest to be balanced.

### b. Qualified Immunity

As set forth above, the United States Supreme Court has held that an improper eviction may, by virtue of interfering with a person's possessory interest, constitute a Fourth Amendment seizure. *Soldal*, 506 U.S. 56; *accord Gerhart*, 2009 WL 2581715. Since then, lower courts have varied as to whether *every* police involvement in an improper eviction constitutes a Fourth Amendment seizure. *See Fleming v. City of Bridgeport*, 935 A.2d 126, 141-43 (Conn. 2007) (collecting and analyzing cases). However, this Court is aware of no case that has extended such protection to a person who *never* enjoyed the status of a legal tenant of the property, as opposed to a holdover tenant whose lease has expired. For this reason, and for the reasons the Court concluded above regarding Ms. Snyder's procedural due process claims, to the extent that Ms. Snyder enjoyed any possessory interest that entitled her to the protections of the Fourth Amendment, such a right was not sufficiently clearly established so as to preclude the application of qualified immunity.

Nor did the Defendant Officers act in a way other than how a reasonable officer in their position would, in light of the law as it was then established. In this case, as the Court has already noted, the police had ample evidence to conclude that Ms. Snyder had no possessory interest in the apartment, which was only bolstered by their consultation with ADA Powanda and reception of his legal advice. Thus, as to Count I, Defendants' Motion for Judgment on the Pleadings is granted.

### 4.   COUNTS III and VI: Fourth Amendment Seizure of Personal Property

Ms. Snyder also alleges in Counts III and VI that her personal property inside the apartment was "seized." She states that that she never recovered her property that was taken as a result of the eviction proceedings, totaling a value of several thousand dollars. Am. Compl. ¶ 222. She alleges that when the Defendant Officers physically removed her, ordered the landlord to change the locks on the apartment, and told her she must make arrangements with him to pick up her property at some other time, they "allowed [the landlord] to take the Plaintiff's property." *Id.* ¶ 218. She avers that Landlord Scalise and/or the McCarls converted the property to their own use. *Id.* She also alleges that Defendants Rizzo, Novak, and Dreistadt at one point watched Mr. McCarl and the Constable box up Ms. Snyder's personal possessions, but did not intervene. *Id.* ¶¶ 113-14.

As discussed above, the Fourth Amendment protects against unreasonable governmental interference of possessory interests in property. Ms. Snyder certainly enjoyed a possessory interest in her personal property, by virtue of her ownership of it, located inside the apartment. *See Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209-10 (3d Cir. 2001). She has also pled sufficient facts to support (but not require) a conclusion that the Defendant Officers' actions were the cause of her deprivation; it is irrelevant that the police are not in custody of the seized

property, as long as they were part of the "meaningful interference" related to its seizure, which they might have been. *See id.*; *Gale*, 608 F. Supp. 2d 629. In addition to alleging an interference with a possessory interest in property, the plaintiff must demonstrate that the deprivation was unreasonable. The "reasonableness determination will reflect a careful balancing of governmental and private interests." *Soldal*, 506 U.S. at 71 (internal quotation omitted).

Here, whether the police acted reasonably when they interfered with Ms. Syder's personal property is a fact-intensive question that cannot be resolved at this stage of the case. On the one hand, the deprivation could be considered to be reasonable in light of (1) the few days' advance notice Ms. Synder received before she was forcibly removed from the premises, during which time she could have moved her personal property; (2) the fact that the Defendant Officerss instructed the landlord to make private arrangements for Ms. Snyder to return to the apartment to retrieve her belongings; and (3) generally, the fact that the deprivation was necessary to effect the ouster from the apartment. On the other hand, the officers may have acted unreasonably in depriving her of her personal property if they could have put in place other measures to ensure that Ms. Snyder's belongings were returned to her.

As for qualified immunity, the right under the Fourth Amendment to be free from an unreasonable seizure of personal property is well established. *See Brown*, 269 F.3d at 211. It is important to note that the question here, whether Defendant Officers acted unreasonably in light of clearly established law when they seized Mrs. Snyder's personal property, differs from the inquiry relating to the "seizure" of the apartment. While it was reasonable for the Defendant Officers to believe that Ms. Snyder was not entitled to lawful possession of the apartment, and thus that they were not "seizing" it from her, it does not follow that it was reasonable for them to believe that Ms. Synder concomitantly lacked a valid possessory interest in her personal property

28

located therein. Whether the officers acted reasonably in light of clearly established law will require consideration of the facts yet to be developed, a determination more properly made at the summary judgment phase. Therefore, Defendant Officers' Motion for Judgment on the Pleadings as to Counts III and VI is denied without prejudice.

### 5. **Fourth Amendment Illegal Arrest**

Ms. Snyder alleges that when she failed to exit the premises as requested, she "was placed in the back of a police car and driven to the police station," where she was photographed and fingerprinted.  Am. Compl. ¶¶ 150-51. While Ms. Snyder's counts of constitutional violations are voluminous, they do not include an allegation that she was the subject of an illegal arrest violative of her rights secured by the Fourth Amendment. Ms. Snyder's only mention of the illegality of her "removal from the property" is to demonstrate that such physical removal allowed for the unreasonable seizure of the apartment and her property inside of it: "By directing removal of the Plaintiffs from their residence . . . [Defendant Officers] allowed William Scalise to take the Plaintiffs [sic] property." Am. Compl. ¶ 218. As such, the Court notes that any claim of false arrest Ms. Snyder may attempt to bring is denied with prejudice.

The Court notes that even if such a claim could be divined from the Amended Complaint, Ms. Snyder's arrest did not constitute an unreasonable seizure. A "warrantless arrest of a person is a species of seizure required by the [Fourth] Amendment to be reasonable." *Payton v. New York*, 445 U.S. 573, 585 (1980). It is well established that when an officer has probable cause to believe a person committed even a minor crime in his presence, the arrest is reasonable. *See Virginia v. Moore,* 553 U.S. 164, 171 (2008) (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). Under Pennsylvania law, an individual commits defiant trespass when she remains in any place where she is not licensed or privileged to do so and, though actual communication

has been given notice of her status as a trespasser. 18 Pa. C.S.A § 3503(b). Defiant trespass is a third degree misdemeanor carrying with it a maximum sentence of one year of imprisonment. *Id;* 18 Pa.C.S.A. § 106.

Here, the communications of Landlord Scalise and Mrs. McCarl in the presence of the police to Ms. Snyder that she was not permitted to remain on the premises, the inspection of the lease, the results of running Ms. Snyder's driver's license, and the ADA's legal advice, together established probable cause that Ms. Snyder was committing the crime of defiant trespass. Accordingly, there was sufficient probable cause to effectuate the arrest given the circumstances known to the police at that time. The officers did not act unreasonably contrary to any clearly established law in so doing, as set forth by *Payton,* 445 U.S. 573, *Atwater,* 532 U.S. 318, and *Moore,* 553 U.S. 164. Therefore, the removal of Ms. Snyder from the premises did not constitute a violation of her clearly established Fourth Amendment right against unreasonable seizures of the person.

### 6. COUNT VII: First and Fourth Amendment Claims – Videotaping

Ms. Snyder alleges that when her minor son E.S. attempted to videotape the police "evicting" the two of them, the police told him to turn the camera off because he was violating the Pennsylvania Wiretap Act, and E.S. complied. Am. Compl. ¶ 143-44. She also alleges that this instruction came "under threat of arrest." *Id.* ¶ 238. She alleges this happened in an earlier interaction also, but does not specifically state who was filming. *Id.* ¶ 99 ("Plaintiffs attempted to turn on their video camera.") Ms. Snyder claims that these actions violated both Plaintiffs' First and Fourth Amendment rights. The Court disagrees. First, Ms. Snyder's Fourth Amendment claims cannot stand because the Fourth Amendment is predicated on governmental intrusions of

privacy and property, *see United States v. Jones*, 132 S. Ct. 945 (2012), and there is simply no privacy or property right that logically inheres *in the one filming* when he records a tape.

Second, the Court notes that all claims asserted by Ms. Snyder on behalf of her minor son have been dismissed. Thus, at least as to the second attempted video recording, Ms. Snyder's only viable constitutional claim in her own right would have to result from third party standing – i.e., that E.S.'s videotaping of the events was sufficiently closely related to his mother's expressive rights. Because the prudential considerations against third party standing are relaxed in First Amendment cases due to concerns related to the potential chilling effects of the government's actions, *Shimer v. Washington*, 100 F.3d 506, 508-09 (7th Cir. 1996); *see McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 239 (3d Cir. 2010) (relaxed standing in First Amendment overbreadth challenge), and viewing the facts in the light most favorable to Ms. Snyder, the Court will assume *arguendo* that Ms. Snyder has standing to bring a First Amendment claim in her own right.

Even if Ms. Snyder were able to make out a constitutional claim apart from her son's, she is barred on this claim by qualified immunity. There is no clearly established, "unfettered" constitutional right, in generalized terms, under the First, Fourth, or any other Amendment, to record police officers in the performance of their duties. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010) (surveying case law); *Matheny v. Cnty. of Allegheny Pa.*, Civ. A. No. 09-1070, 2010 WL 1007859, at *4 (W.D. Pa. Mar. 16, 2010) (same); *True Blue Actions, LLC v. Foster*, No. 11-242, 2012 WL 2149801, at *4 (W.D. Pa. Apr. 9. 2012). The Third Circuit held in

*Kelly* that there was no clearly established First Amendment right to record the police while conducting a traffic stop given the inconsistency of prior law.[11] The court explained:

> Although *Smith* and *Robinson* announce a broad right to videotape police, other cases suggest a narrower right. *Gilles* and *Pomykacz* imply that videotaping without an expressive purpose may not be protected, and in *Whiteland Woods* we denied a right to videotape a public meeting. Thus, the cases addressing the right of access to information and the right of free expression do not provide a clear rule regarding First Amendment rights to obtain information by videotaping under the circumstances presented here.

*Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010); *see also Matheny*, 2010 WL 1007859 (concluding the same outside traffic stop context). The outcome of this case is dictated by *Kelly*. Because there was no "clearly established" right to videotape police in the performance of their duties at the time of the alleged violation here, Defendant's Motion for Judgment on the Pleadings as to Count VII is granted.

## C. FAILURE TO DISCLOSE ASSISTANCE OF LEGAL COUNSEL

Lastly, Defendant Officers argue that Ms. Snyder's claims should be dismissed in their entirety on the grounds that, although she claims to be appearing before the court pro se, she is in fact being assisted by an attorney who is "ghostwriting" her pleadings. ECF No. 42 ¶ 9; ECF No. 41 at 12. The only evidence Defendants offer in support of this allegation, however, is that the Amended Complaint "is extremely detailed and complex and could only have been written by an experienced legal practitioner." *Id.* In response, Ms. Snyder asserts that she is not receiving any legal assistance in this matter and the sophistication of her briefing is instead a result of "her considerable legal experience having filed over 90 state and federal lawsuits." ECF No. 48 at 11 (internal quotations omitted).

---

[11] While *Kelly* determined that there was no "clearly established" right as of May 2007, there has been no significant development of First Amendment law in the Third Circuit between then and July 2011 that would suggest that the law had materially changed.

Ghostwriting by an attorney is a misrepresentation to this Court which is not permitted. The practice gives the "pro se" plaintiff who would otherwise be entitled to special leniency an unfair advantage, and violates an involved attorney's duty of candor to the Court. *See Delso v. Trs. for Ret. Plan for Hourly Emps. of Merck & Co., Inc.*, CIVA 04-3009 AET, 2007 WL 766349 (D.N.J. Mar. 6, 2007); *United States v. Eleven Vehicles*, 966 F. Supp. 361, 367 (E.D. Pa. 1997), *vacated and remanded on unrelated grounds by* 200 F.3d 203 (3d Cir. 2000). While the Court notes that the American Bar Association and the Pennsylvania Bar Association have in recent years regarded ghostwriting with more leniency than in the past, Pa. Bar Ass'n Comm. on Legal Ethics and Prof'l Resp. Joint Formal Op. 2011-100 (2011) at 12, ABA Standing Comm. on Ethics & Prof'l Resp., Formal Op. 07–446, (2007), *superseding* ABA Comm. on Ethics & Prof'l Resp., Inf. Op. 1414 (1978), in this Court's view, such activity constitutes an impermissible misrepresentation to the Court, and a fundamental breach of any involved attorney's duty of candor.

Given the lack of any definitive evidence pointing to Ms. Snyder's representation by a licensed attorney or to the identity of that attorney, the Court will not take any adverse action against Ms. Snyder in that regard at this time, and that portion of Defendants' motion is denied without prejudice. However, if Ms. Snyder is in fact receiving the assistance of an attorney, that attorney is required to enter his or her appearance before the Court. Should the Court later determine that Ms. Snyder has received the assistance of a lawyer who has failed to enter his appearance before the Court, appropriate sanctions, including contempt against both Ms. Snyder and any involved attorney, will be considered at that time.[12] Thus, Defendants' Motion for Judgment on the Pleadings on this ground is denied without prejudice.

---

[12] This judicial exhortation and warning is a one-time, last-time opportunity for Ms. Synder and any involved attorney to, in essence, come clean with the Court (and to other parties) if indeed ghostwriting is involved. Should

**D. Conclusion**

The Amended Complaint tells a tale of events sprawling several days and swathed in uncertainty. Even so, it was apparent to all parties that Ms. Snyder had no legal right to be on the property on which she was asserting her rights as a "tenant." To this end, the Defendant Officers seek qualified immunity on the grounds that their actions were reasonable in light of clearly established federal law. Although the Court has not concluded that Defendants were entitled to qualified immunity with regards to all counts of the Amended Complaint at this stage, this does not mean that Defendants' arguments as to the claims still remaining are meritless. Rather, given the factual record as it currently stands, and giving the presumption of truth to facts as asserted by Ms. Snyder, it cannot be definitively determined at this stage in the case that all of Defendants' actions were cloaked in the reasonableness necessary for a blanket grant of immunity.

An appropriate order will issue.

Mark R. Hornak
United States District Judge

Dated: September 28th, 2012

cc:     All counsel of record

that be the case, and they have passed on this opportunity to conform to their obligations, stern judicial action will follow. On the other hand, prompt revelation at this point will not so result.